UNITED STATES of America

v.

H. William JOHNS.

Crim. No. 87–00376.

United States District Court,
E.D. Pennsylvania.

June 18, 1990.

William Carr, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Edward F. Borden, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

### I. *Introduction*

The defendant, H. William Johns, was employed by Acme Markets, Inc., between May of 1979 and November of 1984, as director of packaging, equipment, and supplies procurement. Before May of 1979, he worked for Acme first as a quality control supervisor, and later as a packaging buyer. As director of packaging, equipment, and supplies procurement, Johns was responsible for Acme's purchases of non-resale items, such as bags, cans, packaging supplies, and janitorial supplies and services.

In August of 1979, Johns arranged for the incorporation in New Jersey of a company called "Pak-all." In April of 1983, he arranged for the incorporation of "Alma Trading Corporation" and "Garo Service Corporation," also New Jersey companies. Johns' name did not appear on any of the incorporation papers for these companies, nor was he formally listed as an officer, director, or shareholder of any of them. These companies basically performed no services, but primarily acted as shells for Johns to deposit, withdraw, and transfer funds. Acme was not aware of the existence of these companies or of Johns' affiliation with them.

Beginning in October of 1979 and continuing through March of 1985, without Acme's knowledge or consent, Johns agreed with six of the brokers and vendors who supplied non-resale goods and janitorial services to Acme that these brokers and vendors would deposit sums of money representing a percentage of the business their companies did with Acme into Pak-all and Alma checking accounts in exchange for continued business with Acme. These brokers and vendors paid a total of almost $2 million in kickbacks into Pak-all and Alma accounts at Johns' direction and for Johns' personal financial benefit between October of 1979 and March of 1985. All of the parties involved took pains to ensure

that Acme was unaware of these kickback payments. At all times, the payments were contrary to Acme's official conflict of interest policy.

As a result of the defendant's arranging for the payment of kickbacks to entities he controlled, the government charged him with thirty-eight counts of mail fraud, 18 U.S.C. § 1341 and § 2, nine counts of Travel Act violations, 18 U.S.C. § 1952 and § 2, and nine counts of violating the National Stolen Property Act, 18 U.S.C. § 2314 and § 2. Defendant waived his right to a jury trial. He and the government then submitted to me a comprehensive stipulation of facts and memoranda supporting their diverging positions as to whether the government had sustained its burden of proof. I later heard oral argument on the parties' briefs. For the reasons set forth below, I conclude that defendant H. William Johns is guilty of the mail fraud and Travel Act charges, but is not guilty of violating the National Stolen Property Act.

In accordance with Fed.R.Crim.P. 23(c), this opinion constitutes my special findings of fact and conclusions of law. For the purposes of this opinion, I have adopted the parties' stipulation of facts in its entirety.[1]

## II. The Mail Fraud Counts

Defendant's brief in support of his request for a verdict of not guilty challenges the legal sufficiency of the bill of indictment in light of the Supreme Court's sweeping decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and also attempts to defeat the merits of the government's proof, as described in the stipulation of facts, in the event the indictment withstands judicial scrutiny. Because I find that the conduct alleged in the indictment charges an offense under *McNally*, and that the government has satisfied its burden of proof with respect to this offense, I conclude that Johns has violated section 18 U.S.C. § 1341 as interpreted by *McNally*. The reasons for this decision are discussed *infra* at subsections A and B.[2] Even if I were to have found that the government's indictment alleged only an "intangible rights" theory of prosecution, temporarily invalidated by *McNally*, I would nonetheless conclude that Johns' conviction is proper in light of the post-*McNally* addition of section 1346 to the mail fraud chapter of the criminal code, which effectively overruled *McNally*. As discussed *infra* at subsection C, there is no *ex post facto* problem with retroactive application of section 1346 to Johns' conduct.

### A. The indictment properly alleges an offense under *McNally*.

#### 1. Under *McNally*, mail fraud requires a showing of property loss.

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court addressed for the first time whether the statutory and legislative history of the mail fraud statute, 18 U.S.C. § 1341, would support a tradition of court of appeals decisions interpreting that statute as proscribing schemes to defraud another of the intangible right

---

1. The stipulation of facts is appended to the conclusion of this opinion. The brief summation of facts in the introduction to this opinion is my own, derived from the parties' stipulation.

2. In subsection A, I discuss the sufficiency of the mail fraud theories alleged in the indictment in light of *McNally*. Although I previously refused defendant's various pretrial motions to dismiss the indictment, *see United States v. Johns*, 688 F.Supp. 1017 (E.D.Pa.1988), Johns has asked that I reconsider that holding on the basis of recent court of appeals decisions interpreting the "money and property" requirement of *McNally*. In particular, following my deci-

sion, the Third Circuit decided *United States v. Zauber*, 857 F.2d 137 (3d Cir.1988), *cert. denied sub nom., Scotto v. United States*, —— U.S. ——, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), and *United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989), two appeals from mail fraud convictions, and *United States v. Osser*, 864 F.2d 1056 (3d Cir.1988), a request for *coram nobis* relief from a 1972 mail fraud conviction. In deference to the Third Circuit, I will re-evaluate the government's mail fraud charges. In subsection B, I will determine whether the government has met its burden of proof with respect to those charges.

to honest and impartial services.[3] The *McNally* defendants, individuals who exerted control over the selection of workmen's compensation insurance for the Commonwealth of Kentucky, were charged with committing mail fraud by engaging in a scheme to give the commonwealth's insurance business to a large insurance agency that agreed to split its commissions with smaller agencies owned or controlled by the defendants. The government's principal theory at trial was that the defendants had participated in a self-dealing patronage scheme to defraud the citizens of Kentucky of certain intangible rights, in particular, the right to have the commonwealth's affairs conducted honestly. *McNally*, 483 U.S. at 352, 107 S.Ct. at 2877. Disagreeing with a long line of decisions from the courts of appeals, the Supreme Court construed the mail fraud statute to reach *only* frauds in which the alleged victim had been deprived by the defendants of money or property. *Id.* at 359, 107 S.Ct. at 2881. Because the jury instructions in *McNally* permitted the jury to base guilt solely on loss of the intangible right to honest government and did not require it to find that the citizens of Kentucky had lost money or property, the Court reversed the convictions.

Later, in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court clarified its decision in *McNally*. Holding that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights," *id.* at 25, 108 S.Ct. at 320, the Court sustained the conviction of a former journalist for the Wall Street Journal who sold the Journal's confidential pre-publication financial information to securities brokers who then traded stocks on the basis of this information. The Court deemed the confidential material to be "property" within the meaning of the mail fraud statute and determined that the Journal had been "defrauded of much more than its contractual right to [defendant's] honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights.'" *Id.* (quoting *McNally*, 483 U.S. at 359, 107 S.Ct. at 2881).[4]

Invoking *McNally* and *Carpenter*, a significant number of pre-*McNally* criminal

3. *See, e.g., United States v. Clapps*, 732 F.2d 1148 (3d Cir.), *cert. denied*, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Mandel*, 591 F.2d 1347 (4th Cir.), *aff'd in part on reh'g*, 602 F.2d 653 (4th Cir.1979) (en banc) (per curiam), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Keane*, 522 F.2d 534 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. States*, 488 F.2d 761 (8th Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

4. The distinction between an "individual property right," protected under the *McNally* version of the mail fraud statute, and an "individual right" to something other than a *McNally*-type property interest appears elusive at first glance. In contexts other than mail fraud, the Supreme Court has recognized property rights to such "ethereal" concepts as employment, *see Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), welfare benefits, *see Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and education, *see Goss v.*

*Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), based solely on the fact that entitlements were created by legislative enactment or by individual contracts. These entitlements were granted "property right" status because they could not be revoked, once conferred, without procedural due process. *See Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Nonetheless, after *McNally*, courts could not recognize these entitlements as *McNally*-type property rights for purposes of the mail fraud statute. Although one's interest in one's job, in welfare benefits, and in education could not be suspended, once granted, absent appropriate procedural safeguards, one could not buy, sell, trade, or distribute these personal interests. One could not "entrust" them to another or claim a right to use them exclusively. *See Carpenter v. United States*, 484 U.S. 19, 26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987). As such, these interests are deemed "property" for purposes of the Fourteenth Amendment, but not for purposes of the mail fraud statute, in which Congress apparently intended to apply a narrower definition. *See United States v. Evans*, 844 F.2d 36, 41 (2d Cir.1988) ("[T]he fact that the common law recognizes some rights to control alienation as property does not mean that all such rights are property rights within the meaning of the federal fraud statutes.")

convictions have been challenged on the basis that verdicts were rendered pursuant to an impermissible intangible rights theory of prosecution. In general, the courts of appeals have responded to these challenges by overturning those convictions in which the indictment alleged only a deprivation of intangible rights or in which the jury instructions did not require that money or property interests be implicated, *e.g.*, *United States v. Zauber*, 857 F.2d 137 (3d Cir.1988), *cert. denied sub nom., Scotto v. United States*, — U.S. —, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989); *United States v. Holzer*, 840 F.2d 1343 (7th Cir. 1988); *United States v. Covino*, 837 F.2d 65 (2d Cir.1988); *United States v. Murphy*, 836 F.2d 248 (6th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988), and by affirming those convictions in which it was clear that the jury could not have reached a guilty verdict without concluding that the victim of the fraudulent scheme suffered a monetary or property loss at the hands of the defendant, even where the government relied in part on the deprivation of intangible rights, *e.g.*, *United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989); *United States v. Perholtz*, 836 F.2d 554 (D.C.Cir.1988); *United States v. Piccolo*, 835 F.2d 517 (3d Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988); *United States v. Fagan*, 821 F.2d 1002 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).

Significantly, the courts have generally concluded that kickback schemes—traditionally, one of the most common forms of criminal activity for which pre-*McNally* convictions were obtained on an intangible rights theory of mail fraud—will no longer implicate section 1341 unless the indictment charges and the *government's proof* establishes that the alleged victim of the scheme, as opposed to the payor of the kickbacks, lost a cognizable, and not merely a "constructive," interest in money or property as a result of the artifice. *See McNally*, 483 U.S. at 360, 107 S.Ct. at 2881 (" 'There are no constructive offenses; and before one can be punished, it must be

shown that his case is plainly within the statute.' ") (quoting *Fasulo v. United States*, 272 U.S. 620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926)); *United States v. Holzer*, 840 F.2d 1343, 1346–47 (7th Cir.1988) (rejecting the "constructive trust" theory, a legal fiction of property loss in which the government had tried to argue that bribe money received by the defendant, a state trial judge, from lawyers appearing before him properly belonged to the public, to whom he owed a fiduciary duty). *But see United States v. Little*, 889 F.2d 1367, 1368 (5th Cir.1989) (presumption that county lost money when contractor paid kickbacks to defendant), *cert. denied*, — U.S. —, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990).

Paragraph ten of the Johns indictment contains the government's mail fraud theories. The government charges that:

> From on or about June 15, 1978, to on or about March 5, 1985, in the Eastern District of Pennsylvania and elsewhere, defendant H. William Johns devised and intended to devise a scheme and artifice to:
>
> (a) defraud Acme of the salary it paid to him and other benefits it provided to him in reliance upon and in exchange for his loyal, faithful and honest services, free from conflict of interest;
>
> (b) obtain money and property from Acme and certain brokers and vendors doing business with Acme, by means of false and fraudulent pretenses, representations and promises; and
>
> (c) defraud Acme of the secret money and property obtained by him in the performance of his duties as an Acme employee.

According to the indictment, it was the object of the scheme to defraud that Johns "would obtain payments and kickbacks from vendors and brokers who sold goods and services to Acme, which payments and kickbacks would be concealed from his supervisors at Acme." Indictment at ¶ 11. Paragraphs twelve through twenty-one set forth the "means" by which Johns allegedly carried out the scheme. Specifically, the government charges that on two occasions, once in 1978 and once in 1982, Johns

falsely represented on Acme's conflict of interest questionnaires that during the two years preceding the date of the questionnaire he had not benefitted financially from any business transactions between Acme and any other person or corporation. The indictment also charges that Johns arranged for the incorporation of Pakall, Alma, and Garo, corporations he secretly controlled and used to receive and to disburse kickbacks from vendors and brokers doing business with Acme. As part of the means of the scheme to defraud Acme, the indictment alleges that various brokers and vendors paid Johns kickbacks which were deposited into Pak-all, Alma, and Garo, and about which his superiors at Acme were never notified.[5] The United States mails were used to transmit the purchase orders, invoices, and checks between Acme and the brokers and vendors involved in the scheme and to transmit Johns' kickback checks.

2. *Subparagraph 10(a) of the indictment charges that Acme was deprived of its property by Johns' fraud.*

■ Johns maintains that subparagraph 10(a) of the indictment is no more than the impermissible tangible rights theory in disguise which nonetheless runs afoul of *McNally.* Johns contends that "to avoid charging the discredited loyal-and-faithful-services theory directly, the indictment charges that Acme was defrauded of 'the salary and benefits it paid to [Johns] and other benefits it provided to him in reliance upon and in exchange for [those same] loyal, faithful, and honest services' which

may not form the basis of an indictment." Dft's Mem. at 11 (emphasis in original). While Johns may be correct that subparagraph 10(a) is an "exercise in creative legal drafting," *id.,* that, alone, is no ground for its dismissal. A plain reading of 10(a) charges Johns with defrauding Acme of the salary and benefits it paid to him, which would constitute a property loss contemplated by *McNally.* There is no authority which requires or even permits me to look beyond the wording of an indictment in order to rewrite it based on the defendant's hypothesis of the government's intent.[6]

Nonetheless, I am cognizant that the legitimacy of the government's "salary theory" is largely undecided by the courts of appeals, and for this reason, a thorough discussion of the basis for my decision to uphold it is warranted. I am aware of only one appellate court that has considered the salary theory the government has presented here as the basis for a post-*McNally* mail fraud conviction, but I decline to adopt that court's holding and analysis. In *United States v. Goodrich,* 871 F.2d 1011 (11th Cir.1989), the defendant, a Florida attorney, was accused of devising a scheme to bribe three county commissioners of Hillsborough, Florida, with the intent to influence them regarding certain zoning petitions. Contending that the county lost money by paying the costs associated with holding "sham" commissioner meetings at which the allegedly fraudulent zoning petitions were decided, the government

---

5. Paragraph five of the indictment charges that between 1972 and 1980 one of the brokers, Robert P. Annick, made payments to Unique Packaging and Design Consultants, a sole proprietorship owned by Johns' wife, a portion of which constituted kickbacks to Johns for Annick's business with Acme from which Annick received a commission. In a bill of particulars provided by the government to Johns, the government explained that the "money and property" described in paragraph 10(b) of the indictment referred in part to the kickbacks paid by Annick to Unique. *See* Govt's Answer to Dft's Motion for Bill of Particulars at 1(a). Because the indictment charges that the scheme began "on or about June 15, 1978," any kickback payments made to Unique before this date would not be actionable. Although the kickback payments to Unique are not realleged in

paragraphs twelve through twenty-one of the indictment as part of the "means" of the scheme, their incorporation into paragraph 10(b) indicates the government's intention to include them as objects of the scheme.

6. The fact that subparagraph 10(a) appears to accuse Johns of breaching a fiduciary duty to Acme in addition to defrauding it of money and salary is hardly grounds for dismissal. Indeed, every scheme to defraud describes an implicit, if not explicit, breach of the defendant's fiduciary duty or duty of good faith to the alleged victim of the fraud. If no duty to be truthful and faithful existed, and if the alleged victim did not "believe" the misrepresentations of the defendant, then, of course, there could be no "fraud."

charged Goodrich with defrauding the citizens of Hillsborough of, *inter alia*, "the salaries, emoluments, and services of elected and appointed personnel of Hillsborough County, Florida." *Id.* at 1012. The Eleventh Circuit affirmed the district court's decision to dismiss this portion of the indictment, concluding, as Johns would have me conclude, that "the property interest alleged to have been denied the victim here—what the government contends Hillsborough County paid salaries for but did not get—is the 'honest and faithful services' of the County Commissioners, an interest *McNally* held to be unprotected by the mail fraud statute." *Id.* at 1013.

Although the Third Circuit has not yet had an opportunity to consider the salary theory as charged in Johns' indictment, I am confident that if the issue were before it, it would reject the narrow approach taken by the Eleventh Circuit in favor of an approach that presumes the validity of a mail fraud indictment in which legitimate property interests are clearly at stake. In *United States v. Asher*, 854 F.2d 1483 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989), upholding a pre-*McNally* conviction, the Third Circuit held that "[w]here ... a violation of the rights involved would result in depriving another of something of value, and the indictment, the proofs and the instructions are based on that fact, then the presence of intangible rights language will not prove fatal on appeal." *Id.* at 1494. The indictment charges Johns with defrauding Acme

of the salary and benefits it provided to him. The money with which the salary and benefits were paid was surely "something of value" to Acme, and was no less an interest in property than was the confidential business information at stake in *Carpenter*. In *McNally*, the Supreme Court refused to infer a loss of property where *only* the loss of intangible rights was charged in the indictment; conversely, I refuse to reword the indictment as the court essentially did in *Goodrich*, 871 F.2d at 1013, in order to find that the government has alleged the deprivation of honest and faithful services when on its face, the indictment charges the loss of salary and benefits.[7]

Justice Stevens, dissenting in *McNally*, contended that a financial loss to an employer is implicit where an employee is disloyal even if that disloyalty caused no *direct* loss of money or property: "When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for." 483 U.S. at 377 n. 10, 107 S.Ct. at 2890 n. 10. (Stevens, J., dissenting). The majority refused to bridge the gap created by what may have been an "apparent," but nonetheless unalleged loss of money, holding that the mail fraud convictions could not stand where the jury "was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured bet-

7. It should be noted that in *United States v. Doherty*, 867 F.2d 47 (1st Cir.), *cert. denied sub nom., Deliere v. United States*, — U.S. —, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989), defendants were implicated in a conspiracy to steal and sell police entrance and promotional examinations and were charged, *inter alia*, with improperly obtaining the salary and benefits that inured to various positions within the police force. *Id.* at 56. Although the First Circuit upheld the defendants' conviction, finding that salary and benefits constituted property under *McNally, id.* at 57, I believe that the court extended its interpretation of salary and benefits beyond the plain language of the indictment, and, in that respect, relied on a theory different from the one I have approved in Johns' case, one which would not withstand *McNally*. The *Doherty* court held that by alleging and proving a loss of salary and benefits, the government was, in effect, estab-

lishing that the citizens had lost their property right to control how the commonwealth's money was spent. *Id.* at 60. While the deprivation of salary and benefits is clearly a tangible property loss, an alleged "loss of control" over the spending of money smacks of intangible rights. In *United States v. Zauber*, 857 F.2d 137 (3d Cir.1988), *cert. denied sub nom., Scotto v. United States*, — U.S. —, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), the Third Circuit rejected the "loss of control" theory as "too amorphous to constitute a violation of the mail fraud statute as it is currently written." *Id.* at 147. The salary theory submitted by the government against Johns would not offend *Zauber*, however, since the government contends that Acme actually lost the money it used to pay Johns' salary and benefits, and not merely its intangible right to control those payments. *See* Govt's Mem. at 4–5.

ter insurance." *Id.* at 360, 107 S.Ct. at 2882. It can be inferred from the court's holding, however, that had the government been able to prove that the citizens of Kentucky paid a higher insurance premium to the insurance agent improperly selected by defendants or had it established that better insurance was available but was overlooked by defendants intent on patronizing their own insurance agencies, and had the jury been instructed as to the need for a finding of such a loss, the convictions would have been upheld. In *McNally,* the government never alleged that the citizens of Kentucky received less than they paid for; however, in its case against Johns, the government contends that Acme was cheated because it did not receive from Johns that for which it was paying him—his honest services.

In *United States v. Schermerhorn,* 713 F.Supp. 88 (S.D.N.Y.1989), the court refused to dismiss an indictment charging defendant with a scheme to defraud the state of New York and its taxpayers of salary and other benefits provided a duly elected state senator. Defendant's acts of mail fraud stemmed from his alleged failure to disclose illegal campaign contributions on financial disclosure statements required under state law. Distinguishing *McNally,* the court held that "[w]holly apart from the breach by defendant of an ethereal duty to fairly and honestly serve the people of New York, the taxpayers in this case paid a salary for 'damaged or contaminated goods' if the mail fraud counts here charged are proven." *Id.* at 92.[8] *Accord United States v. Webb,* 689 F.Supp. 703, 707 (W.D.Ky.1988) (denying motion to dismiss indictment for mail fraud based on salary theory, court holds that government may prove that salary paid to defendant engaged in election fraud constituted overpayment); *United States v.*

*Wellman,* 830 F.2d 1453 (7th Cir.1987) (court upholds conviction for mail fraud despite intangible rights language in indictment because government established that company "lost" money as result of fraud when it received a product of lower quality than that for which it had bargained). I conclude that subparagraph 10(a) of the government's indictment alleges a legally cognizable money or property loss by Acme pursuant to *McNally.* In subsection B, *infra,* I will discuss the merits of the government's proof with respect to this charge as set forth in the stipulation and the government's memorandum.

3. *Subparagraphs 10(b) and (c) of the indictment charge that Acme lost money because Acme overpaid for goods and services and because money secretly paid to Johns belonged to it.*

In a voluntary bill of particulars, the government explains that the "money and property" alleged in subparagraphs 10(b) and (c) consist of the sums set forth in paragraphs 5, 8, and 21 of the indictment. Govt's Answer to Dft's Motion for Bill of Particulars at 1(a), (c). Paragraphs 5, 8, and 21 refer to kickback payments made to Pak-all, Alma, and Unique Packaging and Design Consultants, a sole proprietorship owned by Johns' wife,[9] by various vendors involved in the scheme, as well as checks paid by Acme to these vendors for goods received. The salary and benefits provided to Johns by Acme is *not* mentioned in either paragraph 5, 8, or 21, and it must be assumed, therefore, that the money and property described in 10(b) and (c) are distinct from the losses alleged in 10(a).

A plain reading of 10(b) and (c) leads to the conclusion that while the money and property in (b) refers to the kickback money as well as to the money paid directly by

---

**8.** Although the Second Circuit had not yet had cause to review a mail fraud conviction based on a loss of salary theory, the *Schermerhorn* court reasoned, as I did in my memorandum and order denying Johns' motion to dismiss, that the Second Circuit's decision in *Ingber v. Enzor,* 841 F.2d 450 (2d Cir.1988), implicitly recognized that a deprivation of salary satisfies section 1341, and would have been sufficient to sustain a conviction against Ingber had the jury

been asked to reach a special verdict on each of the government's mail fraud theories rather than a general verdict on all theories, one of which was an impermissible intangible rights theory. *See Schermerhorn,* 713 F.Supp. at 90–91; *Johns,* 688 F.Supp. at 1028.

**9.** *See supra* note 5.

Acme to the vendors, the "secret money and property" in (c) refers *only* to the kickback payments received by Johns. The payments made by Acme to the vendors were in exchange for the goods described in the purchase orders and invoices. There was nothing "secret" about this money. What was "secret" was the money paid by the vendors and brokers listed in paragraph 20 of the indictment to Johns after they had been paid by Acme. The government's memorandum supports such a reading of the indictment, *see* Govt's Mem. at 20–23, inasmuch as the government's argument with respect to subparagraph 10(c) urges my adoption of a constructive trust theory, i.e., that the kickback money received by Johns belonged to Acme. *See also* Govt's Response to Dft's Motion to Strike Paragraphs 10(a) and 10(c) from Indictment at 5. ("This constructive trust theory comes into play only after Johns has obtained money by the means described in paragraph 10(b)"). Furthermore, while subparagraph 10(b) describes a scheme to "obtain money and property from Acme and certain brokers and vendors doing business with Acme," suggesting that Johns received a portion of the money that Acme paid to the vendors, and therefore, that Acme was defrauded when it paid the vendors, the clear implication in subparagraph 10(c), supported by the government's memoranda and bill of particulars, is that Johns' fraud came into play *after* Acme paid money to the vendors when Johns retained and concealed secret payments that properly belonged to Acme.[10]

Johns maintains that subparagraph 10(c) must be dismissed for improperly relying on a theory of property loss rejected by the Third Circuit in *United States v. Zauber*, 857 F.2d 137 (3d Cir.1988), *cert. denied sub nom., Scotto v. United States*, —— U.S. ——, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), as being inconsistent with *McNally*. Were it not for the Third Circuit's clarification of *Zauber* in *United States v. Osser*,

864 F.2d 1056 (3d Cir.1988), Johns might indeed be correct that *any* implication of the constructive trust doctrine in an indictment must fail. In *Osser*, however, the Third Circuit distinguished *Zauber*, explaining that because Osser's indictment charged and the jury was instructed to determine whether the City of Philadelphia, the alleged victim of Osser's scheme, lost money because of the defendant's receipt of kickbacks, the conviction, which stemmed from the allegation that the defendant defrauded the city out of "secret monies obtained ... in the performance of his official duties as City Commissioner," withstood *McNally*. 864 F.2d at 1063.

The constructive trust doctrine and its attending controversy grew out of a seemingly innocuous statement by Justice Stevens in a footnote in his dissent in *McNally*. Invoking principles of agency law, Justice Stevens said, " 'If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.' ... This duty may fulfill the Court's 'money or property' requirement in most kickback schemes." 483 U.S. at 377 n. 10, 107 S.Ct. at 2890 n. 10 (Stevens, J., dissenting) (quoting Restatement (Second) of Agency § 403 (1958)). Relying on Justice Stevens' footnote, a panel of the Sixth Circuit in *United States v. Runnels*, 833 F.2d 1183 (6th Cir. 1987) ("Runnels I"), *rev'd en banc*, 877 F.2d 481 (6th Cir.1989) ("Runnells II"), affirmed the conviction of a union local president for accepting bribes in exchange for referring union employees' workers' compensation claims to a particular law firm. Although the government had relied exclusively on a pre-*McNally*, intangible rights theory of prosecution, the court held that it was more or less implicit that because Runnels accepted a bribe in his role as the union local's president, the money rightfully belonged to the local, of which he was an agent. "[T]he economic deprivation to the

10. Johns realleges the claim raised in his motion to dismiss the indictment that subparagraphs 10(b) and 10(c) describe the same crime and that subparagraph 10(c) should therefore be dismissed as surplusage. I reject his argument because of the distinctions between 10(b) and (c) articulated above and for the reasons described in my pretrial opinion. *See Johns*, 688 F.Supp. at 1020–21. In any event, his claim is now moot. *See infra* part II.B.2.

principal which occurs when the fiduciary knowingly breaches his duty by accepting a bribe, the value of which properly belongs to the principal, is itself sufficient to support a finding of taking of value." 833 F.2d at 1187. The *Runnels I* panel reasoned that by taking bribes in his capacity as fiduciary to the union local, Runnels deprived the union of money in which it had an ownership interest. *Id.*[11]

Before it was vacated and reversed, *Runnels I* was openly criticized by other courts of appeals. *E.g., United States v. Holzer*, 840 F.2d 1343, 1347 (7th Cir.1988); *United States v. Ochs*, 842 F.2d 515, 525 (1st Cir.1988); *United States v. Shelton*, 848 F.2d 1485, 1491–92 (10th Cir.1988); *see also United States v. Slay*, 858 F.2d 1310, 1316 n. 4 (8th Cir.1988). Only the Fifth Circuit adopted the economic benefit/constructive trust reasoning of *Runnels I* and continued to apply it even after the reversal in *Runnels II* to affirm pre-*McNally* mail fraud convictions predicated on a defendant's receipt of kickbacks which deprived others of substantial, albeit intangible, rights. *E.g., United States v. Little*, 889 F.2d 1367 (5th Cir.1989); *United States v. Matt*, 838 F.2d 1356 (5th Cir.), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2020, 100 L.Ed.2d 607 (1988); *United States v. Fagan*, 821 F.2d 1002 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *United States v. Richerson*, 833 F.2d 1147 (5th Cir.1987).[12]

Against this backdrop, the Third Circuit decided *United States v. Zauber*, 857 F.2d 137.[13] In *Zauber*, the trustees and general counsel of a union pension fund were convicted, *inter alia*, of mail and wire fraud and of a RICO conspiracy based on predi-

cate acts of mail and wire fraud. Defendants were charged with scheming to invest the pension fund's money in a mortgage company in exchange for kickbacks. Pursuant to the agreement, the pension fund was to receive a favorable fixed rate of return; hence, although the indictment made reference to a loss of money and property, there was absolutely no allegation or proof at trial that the fund suffered a financial loss as a result of the scheme. The government's theory of prosecution was based solely on the fund's loss of its intangible right to the honest and faithful services of the defendants. *Id.* at 144–45. When the government attempted to argue for the first time on appeal that the kickbacks themselves constituted a property loss to the pension fund on the basis of the defendants' fiduciary relationship to the beneficiaries of the fund, the court, noting that "the *Runnels* fiduciary duty theory is in trouble," *id.* at 146, and that "the constructive trust theory has been flatly rejected by the Seventh Circuit," *id.* (citing *Holzer* 840 F.2d at 1347–49), reversed the defendants' mail fraud convictions and that part of the RICO convictions based on mail fraud stating, "We too reject [the constructive trust theory] as inconsistent with *McNally*," *id.* See also *Ochs*, 842 F.2d at 526 ("With the issue squarely before it, the [McNally] Court held that the mere fact a fiduciary profits from a breach of duty is not a sufficient property deprivation to satisfy the requirements of the mail fraud statute if the property was not directly or indirectly at the principal's expense.").

After *Zauber*, one might persuasively have argued that the Third Circuit would not accept reliance on principles of agency

---

**11.** Less than a year after *Runnels I* was decided, the full court voted to vacate the opinion upon rehearing *en banc*. *United States v. Runnels*, 842 F.2d 909, 912 (6th Cir.1988). The full court eventually reversed the panel's decision, overturning the defendant's mail fraud conviction, on the grounds that the "economic benefit," i.e., constructive trust, theory had not been charged in the indictment or presented to the jury and therefore could not form the basis of the defendant's conviction. *United States v. Runnels*, 877 F.2d 481, 484–85 (6th Cir.1989) ("*Runnels II*"). This inconsistency was the subject of Judge Guy's dissent in the original panel decision. *See*

*Runnels I*, 833 F.2d at 1194–95. In his dissent, Judge Guy states his belief that the economic benefit theory is "sound," *id.* at 1194, despite its inapplicability to Runnels' case; nonetheless, writing for the majority in *Runnels II*, Judge Guy declines to address the continued viability of that theory. 877 F.2d at 484.

**12.** *See infra* note 23.

**13.** At the time *Zauber* was decided, *Runnels I* had been vacated upon rehearing *en banc*. The full court had not yet decided *Runnels II*.

law as the basis of a money or property loss in a mail fraud prosecution. In *Osser*, however, the Third Circuit explained that its decision in *Zauber* was fact specific:

> Unlike the *Zauber, Holzer,* and *McNally* trials, the jury in this case was charged explicitly that it could find financial detriment to the City as a result of the kickbacks and commissions received by Osser. Thus, the trial court did not rely on a constructive trust doctrine as explicated in *Zauber* and *Holzer*.

864 F.2d at 1063. The allegation in the indictment that the court found to withstand *McNally*—indeed the only allegation that did not rely exclusively on the deprivation of intangible rights—charged that the defendant "devised and intended to devise a scheme and artifice to defraud.... The City of Philadelphia out of secret monies obtained by Maurice S. Osser in the performance of his official duties as City Commissioner of the City of Philadelphia." *Id.* at 1058 n. 1. In *Osser*, the defendant, a former city commissioner, was accused of participating in a bid-rigging and kickback scheme for the city's contracts with two printing companies. Although the indictment did not specifically allege that Osser's scheme increased the cost of printing services to the city, the government established this fact at trial. The court seemed satisfied that because the city's alleged loss was based on the theory that the kickbacks increased the price paid, the city's entitlement to the value of the kickbacks was actual, and not merely constructive.[14] *Id.* at 1063–64.

■ The charge in Osser's indictment which the court approved is almost identical to subparagraph 10(c) of Johns' indictment. As *Osser* makes clear, the absence of a specific allegation that Acme paid more money to those sellers who paid kickbacks to Johns than it would have absent the scheme or had it known of the scheme is not fatal to the indictment. So long as the government proves that Acme suffered a net loss of money or property, and not merely a loss of "entitlement" to certain funds, a conviction based on subparagraph 10(c) survives *McNally*.

■ Inasmuch as subparagraph 10(b) alleges that part of the money Acme paid to the brokers and vendors later improperly lined Johns' pockets, a conviction based on subparagraph 10(b) withstands *McNally* if the government establishes that Acme paid an inflated price or otherwise lost money or property because of the scheme. Subsection B, below, discusses the merits of the government's proof.

B. Johns has committed an offense within section 1341 as interpreted by *McNally.*

1. *Johns defrauded Acme of money by receiving his salary and benefits under false pretenses.*

Relying solely on the stipulation of facts between the parties and the inferences reasonably drawn from them, I conclude that the government has sustained its burden of proof with respect to subparagraph 10(a), but not with respect to subparagraphs 10(b) and 10(c) of the indictment. On that basis, however, Johns is guilty of all thirty-eight counts of mail fraud charged in the indictment. Subparagraph 10(a) is "easily separable" from subparagraphs 10(b) and 10(c). *See United States v. Cooke*, 833 F.2d 109, 110 (7th Cir.1987). Subparagraphs 10(b) and 10(c) may simply be treated as "[a] part of the indictment unnecessary to and independent from the allegation of the offense proved ... that 'may be

---

14. The court of appeals denied Osser's request for coram nobis relief from a 1972 mail fraud conviction which had depended, at least in part, on the city's loss of certain intangible rights, on the ground that Osser failed to raise the intangible right issue on direct appeal. 864 F.2d at 1062. Nonetheless, the court "carefully reviewed the factual basis for Osser's conviction," *id.*, before concluding that at least part of the indictment, the proof at trial, and the district court's charge to the jury, required a finding by the jury that Osser's scheme caused the city to lose money. *Accord United States v. Doe*, 867 F.2d 986, 990 (7th Cir.1989) (Although erroneous jury instructions might have resulted in reversal on direct appeal, court denies petition for coram nobis relief finding that substantive scheme alleged in indictment and proved at trial was that defendant, a deputy tax commissioner, accepted bribes in return for reduced property tax assessments, a scheme which deprived his constituents of tax revenues).

ignored.'" *United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985) (quoting *Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927)). Because subparagraph 10(a), standing alone, alleges a violation of the mail fraud statute (so long as the United States mail was utilized to execute the scheme), proof that Johns committed the acts averred in 10(a) is sufficient to convict him.

■ To establish a mail fraud violation, the government must prove beyond a reasonable doubt that Johns (1) engaged in a scheme (2) to defraud Acme of money or property, or to obtain money or property from Acme by means of false and fraudulent pretenses. The evidence must also demonstrate (3) Johns' specific intent to commit fraud and (4) that Johns mailed or caused to be mailed certain items for the purpose of executing the scheme. *See United States v. Goss,* 650 F.2d 1336, 1341 (5th Cir.1981).

■ As an initial matter, Johns concedes at paragraph sixteen of the stipulation of facts that the United States mails were used to transmit all of the purchase orders, invoices, and checks between Acme and the brokers and vendors involved in the alleged scheme. Because Johns was in charge of the accounts of these brokers and vendors, *see* Stipulation ¶¶ 2–9, the items were mailed at his direction, i.e., he "caused them to be mailed." Johns also stipulates at paragraph sixteen that he "arranged for the use of the mail by the brokers and vendors to transmit checks constituting payments from those brokers and vendors to be deposited into Pak–All and Alma bank accounts." Paragraph sixteen covers all of the mailings alleged in the indictment. For the purpose of the mail fraud counts, Johns has conceded that he "mailed or caused to be mailed" the items listed in counts one through thirty-eight. To satisfy the mail fraud statute, "[I]t is sufficient for the mailing to be 'incident to an essential part of the scheme,' ... or 'a step in [the] plot.'" *Schmuck v. United States,* 489 U.S. 705, ——, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (quoting *Badders v.*

*United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)). In this case, there is no question that the United States Postal Service was the vehicle which enabled Johns to execute the scheme.

The government has clearly established the existence of a scheme to defraud Acme. Evidence of an agreement to purchase from certain brokers and vendors in exchange for a percentage of the brokerage commissions or a percentage of the vendors' total sales abounds in the stipulation of facts. *See, e.g.,* Stipulation at ¶ 5 ("[A]t the request of Johns, Annick made payments to Unique Packaging and Design Consultants.... [a portion of which] represented payments to Johns for business with Acme from which Annick received a brokerage commission."); Stipulation at ¶ 14 ("At Johns' suggestion, payments by check were made by the following brokers and vendors doing business with Acme, payable to and deposited into Pak-all and Alma checking accounts ..."); Stipulation at ¶ 21 ("Johns requested and Annick agreed to share with him 40 percent of the commissions Annick received from sales of bags to Acme...."); Stipulation at ¶ 26 ("Within a few months after Anko entered the janitorial supply business with Acme, he and Johns reached an agreement that he would pay to Pak-all 4.5% of the business that Anko did with Acme); Stipulation at ¶ 53 ("[B]y arrangement with Johns, Sabana paid half of (its commission on sales to Acme] to Pak-all"); Stipulation at ¶ 65 ("In mid–1980 Johns told Busel and Posner that they should cease paying commissions to Annick and begin paying them into Pak-all."); Stipulation at ¶ 67 ("In approximately June of 1983, Johns told Busel and Posner that future commission checks should be made to Alma."); Stipulation at ¶ 71 ("Stone gave Johns a check, payable to Alma, for $2,600.48, a portion of the commissions Stone received on Mobil's sales to Acme.")

■ Johns maintains that there is no evidence from which to conclude that the payments to Unique, Pak-all, and Alma were a condition of the brokers' and vendors' continued business relationship with

Acme. I disagree. Although the stipulation points to no express agreement between Johns and any of the brokers or vendors, as Robert Annick explained, "I think the implication was there."[15] Stipulation at ¶ 30. Barry Frazee, a broker serving the Acme account for Champion International, a paper bag manufacturer, testified that he understood that the commission payments he made at Johns' direction to a company called Chelsea Sales[16] were a condition of his doing business with Acme. Stipulation at ¶ 55. It is quite rare that tangible evidence of an unlawful scheme or covert agreement will exist. Its viability often depends on the absence of a traditional contractual relationship, either written or oral, and the existence, instead, of a mutual "understanding," in which performance alone represents offer and acceptance. It is therefore entirely permissible for the government to rely on circumstantial evidence of such a scheme or agreement and for the fact finder to conclude, as I have, that one exists solely on the basis of that evidence.

Likewise, I find there is sufficient evidence in the stipulation of facts of Johns' specific intent to defraud Acme. In May of 1976, Acme's board of directors adopted a conflict of interest policy, applicable to designated employees, mandating prompt disclosure of actual and potential conflicts of interest. Stipulation at ¶ 18; Stipulation at Exh. 1A. The policy defines a "conflict of interest" as "a relationship or transaction that does or may (a) provide gain or benefit to an individual or a member of his family which may be at the expense of ... his or her employer ... (c) affect an individual's objective judgment and/or action with respect to any transaction between the individual's employer, its customers or suppliers." Stipulation at Exh. 1A. As required by the conflict of interest policy, Johns filled out conflict of interest questionnaires in 1978 and in 1982, Stipulation at Exhs. 1B and 1C, in which he falsely represented to Acme that he has not benefitted financially from any "person, firm, partnership, corporation or association with which [Acme] has ... transacted business." Stipulation at Exhs. 1B, ¶ 1(c) and 1C, ¶ 1(c); see also Stipulation at Exhs. 1B, ¶ 1(a) and 1C, ¶ 1(a) (requiring disclosure of any person or corporation with which Acme has transacted business that Johns or a family member "had a financial interest with."); Stipulation at Exhs. 1B, ¶ 1(d) and 1C, ¶ 1(d) (requiring disclosure of any "arrangement, understanding or agreement" not covered by the questionnaire, whereby Johns or a family member "benefit[ted] financially from any business transacted by [Acme].").

I find that Johns' failure to disclose to Acme his relationship with the brokers and vendors who made commission payments to Unique, Pak-all, and Alma, as well as his failure to reveal to Acme his financial interest in those so-called brokerage companies, Stipulation at ¶ 15; Stipulation at Exhs. 1B and 1C, constituted knowing and willful violations of Acme's conflict of interest policy which amounted to intentional fraud.[17]

---

**15.** Robert Annick, incorporated as Anko, Inc., was a broker through whom Johns conducted a large portion of business between Acme and various packaging companies, Stipulation at ¶ 20, including Samson Paper Bag company, Stipulation at ¶ 22. In 1981, Anko became a janitorial supply company. Sales to Acme, coordinated by Johns and his subordinates, constituted eighty percent of Anko's business. Stipulation at ¶ 25. As a broker, Annick shared his commissions with Johns. Stipulation at ¶ 21. As a seller of janitorial supplies, Annick paid a 4.5% kickback to Johns, through Pak-all and Alma, for Anko's business with Acme. See Stipulation at ¶¶ 26, 28.

**16.** Chelsea Sales was the name of a company started by Barbara Evans, an individual who worked part-time for Johns at various Acme locations. Stipulation at ¶ 74. Chelsea Sales received payments from Pak-all and Garo, Stipulation at ¶ 75, as well as direct payments from certain vendors and brokers, such as Champion and Frazee, at John's direction. Stipulation at ¶¶ 51, 52. Although there is no proof that Johns personally benefitted from this arrangement, the agreement between Frazee and Johns concerning payments to Chelsea during the period covered by the indictment, and Frazee's understanding of the agreement, is nonetheless evidence of a scheme to defraud Acme.

**17.** In its voluntary bill of particulars, the government states that the responses Johns provided in his conflict of interest questionnaires and his failure to inform Acme management of the actual and potential conflicts which existed between him and his vendors constituted, in

*See United States v. Carpenter*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (Supreme Court holds that newspaper employee's deliberate violation of employee manual proscribing revelation of confidential prepublication information constituted fraudulent activity and not mere "violation of workplace rules."); *United States v. George*, 477 F.2d 508, 515 (7th Cir.) (employees' violation of employer's conflict of interest policy bore on their intent to defraud), *cert. denied sub nom., Greensphan v. United States*, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *see also Ingber v. Enzor*, 841 F.2d 450, 456 (2d Cir.1988) ("Nothing in *McNally* bars conviction for deprivation of money or property through concealment of a conflict of interest."). I also find that by denying the existence of a personal financial stake in any of the companies or with any of the people with whom Acme does business on two conflict of interest questionnaires, Johns intended to deceive and mislead Acme by false and fraudulent pretenses.[18] Additionally, Johns' deliberate omission of his name as an officer, shareowner, or stockholder on the incorporating papers and on all accounts of Pak-all, Alma, and Garo, Stipulation at ¶¶ 11 and 13, despite the fact that he almost single-handedly controlled these companies and was their principal beneficiary, is further evidence of his intent to defraud Acme.

Finally, I conclude that the government has established beyond a reasonable doubt that Acme lost money in the form of salary and benefits provided to Johns between June of 1978, when the indictment charges that the scheme began, until November of 1984, when Johns was forced to resign from Acme. Accepting as true the characterization in the indictment crediting Johns with being "an aggressive, knowledgeable and determined negotiator" in his dealings with vendors and brokers on behalf of Acme, Stipulation at ¶ 84, and the statements acknowledging that Johns obtained the best prices for Acme from those vendors and brokers implicated in the scheme than he would have absent the scheme, Stipulation at ¶¶ 85, 86; *see also* Stipulation at ¶ 87, I nonetheless find that Acme received less from Johns than his salary and Acme's conflict of interest policy require he deliver.

The conflict of interest policy expressly condemns the conduct in which Johns engaged for a period of at least six years. The policy is evidence of the high priority that Acme placed on honest and ethical services by its employees, free from the type of secret dealings which plagued Johns' tenure with the company. As soon as the policy was adopted in 1976, its mandates became an integral part of the duties and obligations that Johns owed Acme. In exchange for his performing these duties and obligations, Acme paid Johns an annual salary and provided him with benefits. Implicit in the employment relationship is the notion that Acme paid for Johns' honest and faithful services just as it paid for his aggressive negotiations with its customers, his knowledge of the various products which he was responsible for purchasing,

part, the "false and fraudulent pretenses" charged in subparagraph 10(b) of the indictment. *See* Govt's Answer to Dft's Motion for Bill of Particulars at 1(b). It is apparent that those same misrepresentations and omissions enabled Johns to execute the scheme to defraud described in subparagraph 10(a).

18. Johns makes much of the fact that according to Acme's conflict of interest policy, the conflict of interest questionnaire was to be filled out by designated employees twice each year, Stipulation at Exh. 1A, ¶ 2, yet Johns was only asked to complete the questionnaire on two occasions between 1976 and 1984. Johns maintains that this "evidences Acme's disinterest in enforcement of the 'policy.'" Dft's Mem. at 17. I do not find that the evidence points to this conclusion. According to the policy, "disclosure of conflicts of interest, actual or potential, is obligatory." Acme's infrequent use of the questionnaire might just as easily have resulted from its discovering that most employees voluntarily reported conflicts of interest and that there was, therefore, no apparent need for bi-annual reports. While Acme may have become disinterested in the filling out of questionnaires, there is no evidence that it became disinterested in compliance with its conflict of interest policy. On the contrary, during Johns tenure with Acme, the company seemed to be taking steps to make the existence of conflicts of interest less likely and easier to detect. For example, by mid-1982, Acme made known "a general company preference of dealing directly with vendors without a broker." Stipulation at ¶ 19.

his availability during established working hours to Acme's management and to its customers, as well as his diligence in his other job responsibilities. When Johns failed to deliver his honest and faithful services consistent with Acme's policy, Acme clearly paid more and got less than that for which it had bargained.

■ Quoting *United States v. Webb*, 689 F.Supp. 703, 707 (W.D.Ky.1988), a case in which the court overwhelmingly approves of the salary theory as the basis for a loss of money or property under *McNally*, the government avers, " '[T]he essence of fraud is that through false representations, the victim has something, whether it be a product, service or an employee, that is of lesser value than the price paid.' " Govt's Mem. at 5. I agree. Although it is probably true that Johns' salary and benefits were regularly budgeted items that would have been paid to *some* buyer, *c.f. McNally*, 483 U.S. at 360, 107 S.Ct. at 2881 ("Indeed, the premium for insurance would have been paid to some agency...."), foreclosing any argument that Acme would have *saved* money in the form of salary and benefits had it known of the fraud, the proof nonetheless establishes that Acme *lost* money when deprived of its "benefit of the bargain" with Johns.[19] *See Webb*, 689 F.Supp. at 707 (denying motion to dismiss mail fraud indictment in which defendant is charged with scheme to fix county's election of sheriff, court holds that "it is not

the fact that the Commonwealth had regularly budgeted the salary of the Sheriff and intended to pay that salary upon which this case turns but instead the case turns on whether the Commonwealth received for payment of the Sheriff's salary a properly elected official."); *United States v. Schermerhorn*, 713 F.Supp. 88, 92 (S.D.N.Y.1989) ("[T]his court will not abide nor judicially sanction the conclusion that corrupt and non-corrupt elected officials are of equal value. Should it be proven that defendant engaged in the scheme here alleged, we think a presumption arises that the citizenry could have secured a better state senator.").[20]

Having found that the government satisfied its burden of proof with respect to the fraudulent scheme alleged in subparagraph 10(a), I conclude that Johns is guilty of mail fraud on counts one through thirty-eight of the indictment, mailings made in connection with and to execute that scheme. Nonetheless, to establish a complete record for appeal, I will evaluate the government's proof with respect to subparagraphs 10(b) and 10(c).

2. *There was no proof that Acme lost money because its vendors paid kickbacks to Johns as charged in subparagraphs 10(b) and (c) of the indictment.*

■ As discussed earlier, in order to establish a mail fraud violation pursuant to

**19.** Johns argues that "[t]he government's salary theory turns the facts on their head" because, in order to satisfy *McNally*, "the government has been forced to contend ... that the 'tangible property' which Johns schemed to take was *not* the $2 million in fees paid to Pak-all and Alma, but rather was his $50,000 annual salary." Dft's Mem. at 12 (emphasis in original). Johns incorrectly assumes that for the government to prove that he defrauded Acme of his salary and benefits, it must abandon its theory that Johns was after kickbacks. On the contrary, the salary theory is simply one of three distinct theories of property loss advanced by the government. Although I have found that the government satisfies its burden of proof only as to the salary theory, the inference that should be drawn from this conclusion is that while Johns engaged in an elaborate scheme to defraud which included his receipt of over $2 million in kickbacks, the only *McNally* loss suffered by Acme as a result of that scheme came in the form of salary and benefit payments. The existence of the kick-

back scheme is a necessary element of proof in support of the government's salary loss theory. *See* Indictment at ¶¶ 11–12.

**20.** Johns maintains that there is no evidence in the stipulation of facts to establish that Acme would have withheld his salary and benefits or discharged him if it had known of his kickback arrangement. The conflict policy subjects an employee to "disciplinary action" for failing to disclose a conflict of interest, but does not specify what that "disciplinary action" shall be. Dft's Mem. at 14–15. Johns' argument is inapposite. So long as the government establishes that Acme lost money as a result of paying salary and benefits in exchange for services it did not receive, in particular, services free from conflict of interest, the government has satisfied its burden of proof. The government need not also prove that Acme took curative measures to recoup its losses or what Acme would have done had it been aware of Johns' deception.

subparagraphs 10(b) and 10(c), the government must prove that Acme lost money or property, aside from the salary and benefits it paid to Johns, because of the kickback scheme. With respect to subparagraph 10(c), the only loss that would satisfy *McNally*, as interpreted by the Third Circuit in *United States v. Osser*, 864 F.2d 1056, 1063 (3d Cir.1988), is proof that the brokers and vendors involved in the scheme overcharged Acme, and that the amount of the overcharge then lined Johns' pockets. Although the government also argues that I should recognize a constructive loss by Acme due to the legal fiction that it is entitled to the kickback money *regardless of overcharge*, that theory is effectively foreclosed by *United States v. Zauber*, 857 F.2d 137, 146 (3d Cir.1988), *cert. denied sub nom., Scotto v. United States*, —— U.S. ——, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989).

 With regard to subparagraph 10(b), the government argues that Acme lost money or property by means of false and fraudulent pretenses[21] in any one of three ways: (1) that Acme lost its "property" right to control how its money is spent, Govt's Mem. at 7; (2) that Acme was deprived of its "property" right to know material information concerning the amount its suppliers were willing to charge, Govt's Mem. at 8, which "clearly had some economic value," Govt's Mem. at 16; and (3) that the kickback scheme increased the prices charged to Acme by the amount of the kickbacks to Johns, Govt's Mem. at 16. Acme's alleged "loss of control" over how its money was spent and "loss of the right to know" certain material information are not property losses within the meaning of *McNally* and must therefore be rejected as

a matter of law despite proof in support thereof.[22]

In *Zauber*, the Third Circuit held that the "loss of control argument.... is too amorphous to constitute a violation of the mail fraud statute as it is currently written." 857 F.2d at 147. Similarly, the Second Circuit has held that the right to control the alienation of property is not covered by the mail fraud statute. *See United States v. Evans*, 844 F.2d 36, 42 (2d Cir.1988) (rejecting government's theory that its right to control the transfer or resale of United States military weapons from one foreign country to another is a *McNally* property right); *cf. United States v. Perholtz*, 836 F.2d 554, 558 (D.C.Cir.1987) ("Here, defendants did more than assert control over the flow of the subcontractors' funds. Their scheme ensured that the 'negotiated' cost of the subcontracts was higher than the price at which the subcontractors would have been willing to contract [absent the kickback scheme]."). Although the Fifth and Eight Circuits have reached different conclusions, *see United States v. Fagan*, 821 F.2d 1002, 1011 n. 6 (5th Cir. 1987) ("[T]he scheme here was one to deprive Texoma of its property rights, *viz:* its control over its money...."); *United States v. Shyres*, 898 F.2d 647, 652 (8th Cir.1990) ("[D]eprivation of the right to control spending can serve as the basis for a mail fraud conviction."), and the Seventh Circuit has approved a modified version of the loss of control theory, *see Ranke v. United States*, 873 F.2d 1033, 1039 (7th Cir.1989), I am, nonetheless, bound by the mandates of the Third Circuit.

 I conclude that the right to know material information, like the right to con-

---

21. The "false and fraudulent" pretenses consisted of Johns' dishonest answers on two conflict of interest questionnaires, his failure to disclose to Acme management his conflicts of interest and his receipt of significant sums of money from Acme suppliers, and the deliberate omission of his name on Pak-all, Alma, and Garo incorporation papers and accounts. Govt's Answer to Dft's Motion for Bill of Particulars at 1(b). Inasmuch as intentional omissions as well as commissions can constitute fraud, *United States v. White*, 673 F.2d 299, 302 (10th Cir.1982), I find that the government has sus-

tained its burden of proof that Johns made such "false and fraudulent" representations to Acme.

22. In my pretrial opinion, I approved both the "loss of control" and the "right to know material information" as *McNally*-type property interests. *See United States v. Johns*, 688 F.Supp. 1017, 1022 (E.D.Pa.1988). That opinion was handed down before *Zauber* was decided. To the extent that my conclusions here contradict my holding in that opinion, my current analysis, obviously, will govern.

trol spending, is too ethereal to constitute a *McNally* property interest. The government's theory is not analogous to the holding in *United States v. Carpenter*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), where the Supreme Court recognized that the Wall Street Journal, the victim of defendant's scheme, had a legitimate property interest in confidential pre-publication financial information acquired by stock analysts who worked for it in the course of its business. While Acme might determine that certain price information in the hands of its brokers and vendors is valuable to it, it does not necessarily follow that this information belonged exclusively to Acme, that this information was a commodity which Acme could buy or sell, or that the withholding of this information constitutes a *McNally* property loss. In fact, there is no indication that this price information was ever in Acme's possession or that Acme was at any time entitled to it. *See United States v. Slay*, 858 F.2d 1310, 1316 (8th Cir.1988) ("Withholding valuable information is not the same thing as depriving the City of its property, and only the latter conduct violates the mail fraud statutes."); *United States v. Covino*, 837 F.2d

65, 71 (2d Cir.1988) (distinguishing *Carpenter*, court reverses defendant's wire fraud conviction finding that "Covino was charged with depriving NYNEX of material information concerning breaches of his fiduciary duty, not with depriving it of property.").[23]

■ It appears, then, that in order to obtain a conviction under either subparagraph 10(b) or 10(c), the government must prove that Acme paid additional money to its vendors as a result of the kickback scheme. *See Osser*, 864 F.2d at 1064. In the stipulation of facts, the government concedes that the brokers involved in the scheme would each testify that during Johns' tenure with Acme, the prices charged Acme were "less than or equal to those charged other similarly sized purchasers buying on similar terms." Stipulation at ¶ 85. The government also admits that the prices charged by the vendors who made kickback payments to Unique, Pakall, and Alma "were not inflated, in comparison to prices they were charging other accounts, in order to fund the[se] payments." Stipulation at ¶ 86. There is no evidence that Johns could legally have in-

---

**23.** In this regard, I respectfully decline to adopt the reasoning of the Fifth Circuit. Since *McNally*, the Fifth Circuit has consistently assigned an "economic value" to the price information possessed by a payor of kickbacks and a corresponding property interest in that information to the victim of the fraud. The Fifth Circuit has also entitled the government to an automatic presumption that a payor of kickbacks would sell his goods or services for less in the absence of the kickbacks. *See United States v. Little*, 889 F.2d 1367, 1368 (5th Cir.1989), *cert. denied*, ── U.S. ──, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990); *United States v. Matt*, 838 F.2d 1356, 1358 (5th Cir.), *cert. denied* 486 U.S. 1035, 108 S.Ct. 2020, 100 L.Ed.2d 607 (1988); *United States v. Fagan*, 821 F.2d 1002, 1009 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *United States v. Richerson*, 833 F.2d 1147, 1157 (5th Cir.1987). The Fifth Circuit's analysis is thus two-fold: Because the payor of the kickbacks would be willing to sell his product for the stated price less the kickback amount, the victim of the fraud has suffered a cognizable monetary loss. Additionally, the victim has lost his "property right" to know that the price information he had relied on was inaccurate in light of the secret payments.

I do not believe that either of these alleged "losses" should withstand judicial scrutiny. In

the first place, by presuming monetary loss wherever there is evidence of kickbacks, the Fifth Circuit has eliminated one of the elements of the crime from the government's case and has removed from the jury's consideration whether the government has proven this element beyond a reasonable doubt. That an accused shall not be convicted except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he has been charged is one of the oldest and most basic safeguards of due process. The Supreme Court has repeatedly struck criminal convictions which were obtained in contravention of this fundamental right. *See In Re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970) (citing cases); *Speiser v. Randall*, 357 U.S. 513, 525–26, 78 S.Ct. 1332, 1341–42, 2 L.Ed.2d 1460 (1958). Secondly, the "economic value" which the Fifth Circuit has assigned to the price information must fail not only because it, too, is predicated upon judicial presumptions and improper burden-shifting, but also because the withholding of price information which never, in fact, belonged to the fraud victim is not a property deprivation envisioned by either *McNally* or *Carpenter*. *See United States v. Slay*, 858 F.2d 1310, 1316 (8th Cir.1988).

duced the vendors to charge Acme less money even if he were to forego his kickback payments since "Acme made its buyers aware that they were not permitted to violate the Robinson–Patman Act by inducing their vendors to sell to Acme at lower prices, or on terms more favorable, than those offered to Acme's competition." Stipulation at ¶ 85. Although the government makes the argument that in the absence of Johns' scheme, the prices charged by the sellers involved in the scheme *might* have been uniformly lower to all of the sellers' customers, including Acme, there is no evidence in the stipulation of facts from which to infer that this necessarily *would* have occurred. The "simple economic logic" advocated by the government, Govt's Mem. at 16, is no substitute for evidence. Finally, the government accepts as true a study conducted by Acme after Johns' departure from Acme comparing floor care chemicals and material costs. Acme found "that the only competitor willing to supply the same grade product [as] Annick with the same level of service would charge Acme substantially more per year than Annick, perhaps in excess of $400,000." Stipulation at ¶ 87; *see also* Dft's Exh. 28.

The government cannot now claim that Acme paid more money as a result of the kickback scheme. If anything, the evidence suggests that were Acme to have lost its accounts with the vendors implicated in the scheme, its costs would have increased. *See id. Cf. Perholtz*, 836 F.2d at 558 (denying defendants' motions for release pending appeal, court finds that the government, the victim of defendants' fraud, would have paid less money "if the defendants had negotiated subcontracts that did not include the cost of bogus marketing agreements and other kickbacks."); *United States v. Horton*, 847 F.2d 313, 319–20 (6th Cir.1988) (affirming defendant's mail fraud convictions, court holds that because defendant engaged in "short-shipping" to Chrysler Corporation, the victim of his kickback scheme, "there is evidence … not present in *McNally*, that the money Horton received was Chrysler's money."). Having failed to establish that Johns' kickback scheme increased Acme's costs, the government has not sustained its burden of proof with respect to subparagraphs 10(b) and 10(c). *See United States v. Shelton*, 848 F.2d 1485, 1496 (10th Cir. 1988) (reversing defendants' mail fraud convictions, court finds, *inter alia*, that "the evidence of several witnesses established without dispute that the payment of kickbacks had no impact on the way in which the price of county purchases was set.")

C. Johns has violated the mail fraud statute as amended by section 1346 of the mail fraud chapter of the criminal code.

In *McNally*, the Supreme Court deferred to the rule of lenity in interpreting criminal statutes, refusing to venture beyond the plain and obvious language of the mail fraud provision until Congress "speak[s] more clearly than it has":

Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read section 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

483 U.S. at 360, 107 S.Ct. at 2881. The following year, Congress did speak more clearly. On November 18, 1988, Congress passed The Anti–Drug Abuse Act of 1988, and in the process, added section 1346 to the mail fraud chapter of the criminal code:

For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to defraud another of the intangible right of honest services.

Pub.L. No. 100–690, § 7603, 102 Stat. 4508 (1988). Section 1346 restores the scope of the mail fraud statute to its state before *McNally, see* 134 Cong.Rec. H11251 (daily ed. Oct. 21, 1988), and thereby criminalizes schemes to defraud another of the right to loyal and faithful services, regardless of whether the scheme caused the alleged victim to lose money or property.

"The usual rule is that federal cases should be decided in accordance with the law existing at the time of decision." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987). The origin of this rule is almost two hundred years old, dating back to the opinion of Chief Justice Marshall in *United States v. Schooner Peggy*, 1 Cranch 103, 2 L.Ed. 49 (1801) ("It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.") Nonretroactivity is appropriate when it "would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *e.g., Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (holding that it would be inequitable to apply decision specifying state statute of limitations retroactively where decision overruled clear, past precedent on which complainants were entitled to rely). Where the legislative history of an amendment reflects Congress' intent to codify its rejection of a federal court's interpretation of a statute, the courts should respond with particular deference to this amendment, unless one of the *Bradley* exceptions applies. *See Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987); *see also N.L.R.B. v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) ("[S]ubsequent legislation declaring the intent of an earlier statute is entitled to significant weight."), *rev'd on other grounds, N.L.R.B. v. Hendricks County Rural Elec. Membership Corp.*, 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981).

Unquestionably, section 1346 represents Congress' intent to reverse the effects of *McNally*. The language of the amendment and the attending statements of its floor sponsor are direct and unambiguous. *See* 134 Cong.Rec. H11251 (daily ed. Oct. 21, 1988); *United States v. Berg*, 710 F.Supp. 438, 442 (E.D.N.Y.1989). ("The Court is persuaded that both the text of section 1346 and the uncontradicted comments of its floor sponsor indicate Congress's intent to overrule *McNally* and restore the law to its state prior to *McNally*."). There is no legislative directive accompanying the amendment signifying that Congress meant to prohibit its retroactive application. Johns can hardly complain that retroactive application of section 1346 to his conduct would be "manifestly unjust" in view of the fact that at the time he committed the acts with which he has been charged, every court of appeals to consider the issue, in particular, the Third Circuit, had interpreted the mail fraud statute to proscribe schemes to defraud another of the right to honest and faithful services. *See, e.g., United States v. Clapps*, 732 F.2d 1148, 1153 (3d Cir.), *cert. denied* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Frankel*, 721 F.2d 917, 920 (3d Cir.1983); *United States v. Scott*, 701 F.2d 1340, 1343–44 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983); *United States v. Margiotta*, 688 F.2d 108, 122 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir.1981); *United States v. Mandel*, 591 F.2d 1347, 1359–60 (4th Cir.), *aff'd in relevant part on rehearing*, 602 F.2d 653 (1979) (*en banc*), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). At all times from the inception through the termination of the kickback scheme, Johns was on notice that by depriving Acme of his honest and conflict-free services, he was violating the mail fraud statute as it had been interpreted by each court of appeals. *See McNally*, 483 U.S. at 362–68 & nn. 1–5, 107 S.Ct. at 2882–86 & nn. 1–5 (citing cases) (Stevens, J., dissenting). There is nothing unjust about holding a criminal defendant accountable for acts which were unlawful when they were committed and which would likewise be unlawful if committed

today.[24]

Nonetheless, the *Ex Post Facto* Clause of the federal Constitution, U.S. Const. art. I, § 9, prevents Congress from enacting a law "which imposes a punishment for an act which was not punishable at the time it was committed." *Cummings v. Missouri*, 4 Wall. 277, 325–26, 18 L.Ed. 356 (1867); *see Fletcher v. Peck*, 6 Cranch 87, 138, 3 L.Ed. 162 (1810) ("An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed."). A statute violates the clause if it is both retroactive and more onerous than the law in effect when the offense was committed. *Weaver v. Graham*, 450 U.S. 24, 30–31, 101 S.Ct. 960, 965–966, 67 L.Ed.2d 17 (1981). Although the *Ex Post Facto* Clause does not explicitly apply to the judiciary, it is fundamental to the notion of ordered liberty: "If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Bouie v. City of Columbia*, 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964). Accordingly, an employee who committed fraudulent acts as defined by section 1346 could not be convicted on the basis of that amendment if the activity took place between June 24, 1987, the date on which *McNally* was decided, and November 18, 1988, the date on which Congress enacted section 1346.

The indictment charges Johns with engaging in a scheme to defraud Acme between June 15, 1978, and March 5, 1985. His scheme was terminated over two years before he could have invoked *McNally* as a defense to his actions, at a time when the Third Circuit and every court of appeals to consider the issue had concluded that the mail fraud statute covered the fraudulent deprivation of intangible rights. Johns would be hard-pressed to argue that retroactive application of section 1346 in his case renders punishable acts which were not punishable when committed. Although section 1346 did not exist between 1978 and 1985, the conduct it deems punishable today was punishable then under the pre-*McNally* interpretation of section 1341, the text of the mail fraud statute. Section 1346 is no more onerous than the pre-*McNally* "intangible rights doctrine"; thus, Johns cannot claim that he lacked fair notice that the mail fraud statute criminalized his kickback scheme. *See United States v. Berg*, 710 F.Supp. 438, 443 (E.D. N.Y.1989). In Johns' case, retroactive application of section 1346 does not violate the *Ex Post Facto* Clause.

Applying section 1346 to Johns' conduct, I conclude that the government has established beyond a reasonable doubt that Johns deprived Acme of its right to "his loyal, faithful and honest services, free from conflict of interest." Johns intentionally deceived Acme by concealing his financial interest in its accounts and by engaging in an elaborate undercover kickback scheme in which he bartered contracts with Acme in exchange for unlawful commission payments from various brokers and vendors. Johns' scheme violated the letter and the spirit of Acme's conflict of interest policy. Although Johns was indeed "an aggressive, knowledgeable and determined negotiator" in his position at Acme, Stipulation at ¶ 84, he was nonetheless a dishonest and unfaithful one, professing to be a financially disinterested and conflict-free employee, *see* Stipulation at Exhs. 1B and 1C, while all the while he was skimming off profits from Acme's brokers and vendors. Hence, even if I were to have rejected the government's salary theory and instead adopted John's interpretation of subparagraph 10(a) of the indictment, *see* Dft's Mem. at 11, I would nonetheless find Johns guilty of violating section 1341 of the criminal code as Congress has recently dictated that this section should be interpreted. 18 U.S.C. § 1346.[25]

---

**24.** It is worth noting that Johns has conceded that his actions would violate section 1346. *See* Dft's Mem. at 24 ("In fact, Congress recently enacted an amendment to the mail fraud statute which appears to criminalize such conduct.").

**25.** Subparagraphs 10(b) and 10(c) of the indictment remain unaffected by section 1346 of Title 18; hence, regardless of whether or not the current definition of mail fraud is applied to John's conduct, the government has failed to

### III. *Johns has Violated the Travel Act as Charged in the Indictment.*

Counts thirty-nine through forty-seven of the indictment charge Johns with violating the Travel Act, 18 U.S.C. § 1952.[26] Because the indictment specifies that Johns' criminal responsibility for Travel Act violations is also based on section 2 of Title 18, he is punishable as a principal if he caused acts to occur which violate the Act even if he did not directly perform those acts. Specifically, the indictment states that on nine different occasions, Johns

> did use and cause to be used a facility in interstate commerce, with intent to distribute the proceeds of an unlawful activity and otherwise promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of an unlawful activity, that is, commercial bribery in violation of the laws of the Commonwealth of Pennsylvania (18 Pa.Cons.Stat. § 4108).

The facility in interstate commerce which Johns allegedly used or caused to be used to facilitate and distribute the proceeds of an unlawful activity was the United States mail. Section (b)(2) of the Travel Act specifically lists "bribery ... in violation of the laws of the State in which committed" as an unlawful activity proscribed by section (a). 18 U.S.C. § 1952(b)(2). The Supreme Court has held that this encompasses state commercial bribery as well. *Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

The government has established beyond a reasonable doubt that Johns arranged each of the interstate mailings alleged in counts thirty-nine through forty-seven, commission checks drawn on an Anko account and mailed from Anko, Inc., in Lancaster, Pennsylvania, to Pak-all in Teaneck, New Jersey (counts thirty-nine through for-

ty-one) and Alma Trading Corporation in Haddonfield, New Jersey (counts forty-two through forty-seven). Stipulation at ¶¶ 14, 16, and 17. Hence, if there is sufficient evidence from which to find beyond a reasonable doubt that Johns engaged in commercial bribery pursuant to 18 Pa.C.S.A. § 4108 and that he caused the mailings at issue to occur with the intent to facilitate the bribery activity and thereafter distributed the proceeds from this activity, Johns is guilty as charged in counts thirty-nine through forty-seven.

 Pennsylvania's commercial bribery statute states:

> An employee, agent or fiduciary commits a misdemeanor of the second degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon agreement or understanding that such benefit will influence his conduct in relation to the affairs of his employer or principal.

18 Pa.C.S.A. § 4108(a). Johns maintains that there is insufficient evidence to prove beyond a reasonable doubt that there was an "agreement or understanding" between Robert Annick, owner of Anko, and Johns that the payments made from Anko to Pak-all and Alma would influence Johns' conduct with respect to Acme. Johns points to paragraph 30 of the Stipulation of Facts, which quotes a portion of Annick's grand jury testimony:

> Q. Did you understand it to be a condition of your continued business with Acme that you make these payments to [Pak-all and Alma]?
>
> A. I don't think that was ever stated as such. I think the implication was there.

Johns asserts that because Annick could not recall any specific statements made by

---

sustain its burden of proof with respect to those subparagraphs.

**26.** The Travel Act, 18 U.S.C. § 1952, states in pertinent part:

> (a) Whoever ... uses any facility in interstate ... commerce, including the mail, with intent to—
>> (1) distribute the proceeds of any unlawful activity; or ...

>> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), ... and (3), [has committed a federal offense].

Johns in which he spelled out the nature of their financial agreement, one must conclude that the payments from Anko to Pak-all and Alma were never intended to guarantee Anko's business with Acme. Johns is simply wrong. Annick's "understanding" of the "implication" behind the commission payments made into accounts controlled by Johns satisfies the plain language of the statute so long as one can reasonably infer from the evidence that this understanding was shared by Johns.[27] The commercial bribery statute does not require proof of a written or oral contract which manifests the nature of unlawful commission payments. As the government appropriately concludes, based on all the evidence before the court, "[t]here is little else in logic or common sense to explain Annick's payments, but that they were meant to influence Johns' conduct in relation to the affairs of Acme." Govt's Mem. at 25. To accept Johns' interpretation of the facts, one would have to reach the highly implausible conclusion that Annick's regular payments to Pak-all and Alma totalling almost $300,000 over a five-year period were merely "generous whims unrelated to [his] commercial arrangements with Acme." *Id.*

▇▇ Acme constituted eighty percent of Anko's janitorial supply business. Stipulation at ¶ 25. In 1981, several months after Anko was formed, Annick and Johns agreed that Annick would pay Pak-all an amount equal to four and a half percent of Anko's business with Acme. Stipulation at ¶ 26. In August of 1983, per Johns' instructions, Annick began to make commission payments to Alma instead of to Pak-all. Stipulation at ¶ 28. As discussed in part II.B.1., *supra,* Johns made every effort to conceal from Acme the existence of Pak-all and Alma and his relationship with these shell companies. There is no evidence in the stipulation of facts from which to infer that Johns performed any services for Anko other than securing eighty percent of its business with Acme to warrant regular commission payments into secret accounts controlled by Johns. There is also no evidence that either Pak-all or Alma performed any function or service for Anko. Even if I were to glean from the stipulation of facts some plausible benefit awarded by Johns to Annick or to Anko apart from the regular business with Acme, there is no reason why payment to Johns for this "benefit" should have been calculated based on Anko's sales to Acme. In short, I find that the evidence points beyond a reasonable doubt to the conclusion that Annick and Johns agreed that the commission payments from Anko to Pak-all and Alma would influence Johns' conduct with respect to Acme, i.e., would guarantee Anko substantial and regular sales to Acme. There is no question that Johns conducted these activities without Acme's consent.

Johns claims that because the price and quality of Anko's products and services were more favorable to Acme than that of any of Anko's competitors, Stipulation at ¶ 87, he would have continued to buy from Anko even if Annick had stopped making commission payments. This may indeed be true; nonetheless, the fact that Johns would have found it difficult to terminate Acme's relationship with such an attractive supplier as Anko hardly leads to the conclusion that Anko's sales to Acme would have continued at the same rate and on the same terms absent the kickback payments. Had Annick been able to ensure that Acme would constitute eighty percent of Anko's business without making payments to Johns, logic dictates that he would have done so. Quite simply, Annick did not pay Johns close to $300,000 between January of 1980 and March of 1985, *see* Stipulation at ¶ 14, gratuitously. I conclude that Johns

27. Significantly, the implication perceived by Annick is consistent with Barry Frazee's and Samuel Posner's understanding of their companies' financial relationships with Johns, and therefore, with Acme. Both Frazee and Posner owned companies which sold paper bags to Acme. Both testified separately that when they did business with Johns, they were "under the impression" or "understood" that in order to keep or increase business with Acme, they had to deal with and make the appropriate commission payments to the brokers or into the accounts to which Johns referred them. Stipulation at ¶ 55 (Frazee), ¶ 68 (Posner).

violated Pennsylvania's commercial bribery statute. 18 Pa.C.S.A. § 4108(a).

■■■ Johns concedes that the mailings at issue were intended to transmit payments from Anko to Pak-all and Alma. Stipulation at ¶ 16. He also concedes that the payments were made at his suggestion. Stipulation at ¶ 14. Inasmuch as the contents of the mailings constituted the proceeds of commercial bribery, it is clear that Johns intended for the use of interstate mail to facilitate and to promote this unlawful activity in violation of the Travel Act. 18 U.S.C. § 1952(a). The Travel Act's overt act requirement, the "thereafter" act described in section 1952(a), was satisfied when the money transmitted by Annick through the mail was deposited into Pak-all and Alma accounts. This constituted the statutory "distribution" described in subparagraph (1) of the Act. *See United States v. Cole,* 704 F.2d 554, 558 (11th Cir.1983) ("handing over" of money to defendants following the use of an interstate facility is "thereafter" distribution).[28]

Although Johns neither executed the Anko mailings nor placed the money in Pak-all and Alma accounts, these acts were done at his direction. Johns caused the mailing of the kickback payments to occur as well as the distribution of those payments into Pak-all and Alma accounts. He is therefore guilty as a principal under 18 U.S.C. § 2 for violating the Travel Act, 18 U.S.C. § 1952(a). *See id.* at 558–59 (defendants guilty as principals for violating Travel Act where they ordered that proceeds of prostitution be wired to them across state lines and where they caused

these proceeds to be distributed to them after transmission).

## IV. *Johns has not Violated the National Stolen Property Act.*

■■■ Counts forty-eight through fifty-six of the indictment charge Johns with violating the National Stolen Property Act, 18 U.S.C. § 2314, which prohibits the interstate transportation of securities having a value in excess of $5,000, "knowing the same to have been ... converted or taken by fraud."[29] The securities in question are the same Anko checks upon which counts thirty-nine through forty-seven are premised. *See* 18 U.S.C. § 2311 (" 'securities' include any ... check."). Each check is drafted in an amount greater than $5,000, thereby satisfying the dollar minimum of section 2314. It has already been determined that these checks were transferred to Pak-all and Alma in interstate commerce from Lancaster, Pennsylvania, to Teaneck, New Jersey, and Haddonfield, New Jersey, through the mail at Johns' direction. Stipulation at ¶¶ 14, 16, and 17. Therefore, in order to satisfy its burden of proof with respect to counts forty-eight through fifty-six, the government must prove that Johns knew that the checks were converted or taken by fraud, that is, that he knew that Acme had wrongfully been deprived of this money. *See United States v. Gullett,* 713 F.2d 1203, 1210 (6th Cir.1983) ("The words 'stolen, converted or taken by fraud' have been construed to encompass virtually all ways by which an owner is wrongfully deprived of the use of his property."), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984).

28. Johns argues that because two of the charged payments were sent by Annick after Johns was forced to resign from Acme, *see* counts forty-six and forty-seven, they could not have influenced Johns' conduct with Acme and therefore cannot constitute "unlawful activity" under the Travel Act. Whether *these two* payments *in fact* influenced Johns' conduct with Acme is irrelevant. The statute requires only that I find that Johns caused the payments to be sent *"with intent to* ... facilitate ... any unlawful activity." 18 U.S.C. § 1952(a)(3) (emphasis added). The payments could have been connected with bribery activity which pre-dated Johns' resignation, or could have been intended to facilitate unlawful

activity which never reached fruition. I conclude that these payments, like those that were made before Johns left Acme, were *intended* to promote the bribery activity in which Johns and Annick were engaged for over five years.

29. The indictment states that Johns' criminal responsibility with respect to the National Stolen Property Act violations, like the Travel Act violations, is predicated on section 2 of Title 18; hence, Johns is guilty as a principal if he *caused* the securities to be transported in interstate commerce knowing that they were taken by fraud.

Regardless of the extent of Johns' knowledge concerning these checks, the government's proof must fail as a matter of law because, as I explained in part II. B.2., *supra*, Acme was not deprived, either directly or indirectly, of the money which constituted Johns' kickback payments. Although the indictment is silent as to who is the alleged victim of the National Stolen Property Act violations, the government made it clear in subsequent court filings that it intended to prove that Acme, and not Robert Annick or Anko, was defrauded of the kickback money. *See* Govt's Answer to Dft's Motion for Bill of Particulars at 1(e); Govt's Mem. at 28. In part II.B., *supra*, I concluded that the only money of which Johns defrauded Acme during the period covered by the indictment was his annual salary and benefits; therefore, the kickback checks transmitted by Annick from Anko to Pak-all and Alma could not have been "stolen, converted or taken by fraud" from Acme. Although it is possible that Johns defrauded Annick of these securities in violation of section 2314, the government chose not to pursue that theory; hence, Johns is not guilty of the violations charged in counts forty-eight through fifty-six.

## V. *Johns' Renewed Motions to Dismiss the Indictment Must Be Refused.*

In his memorandum in support of a judgment of acquittal, Johns renews his pretrial motions which I had previously denied following a two-day evidentiary hearing. *See United States v. Johns*, 688 F.Supp. 1017 (E.D.Pa.1988). These motions were (1) to dismiss the indictment for failure to present exculpatory evidence to the grand jury; (2) to dismiss the indictment for lack of evidence before the grand jury as to certain offenses; and (3) to dismiss the indictment because of a pattern of violations of Rule 6(e) of the Federal Rules of Criminal Procedure.[30] In support of these motions, Johns relies on the pretrial memoranda he previously filed.[31]

With respect to the motion concerning the alleged failure of the government to present exculpatory evidence to the grand jury, Johns maintains that the government's refusal to inform the grand jury that Acme had suffered no quantifiable loss as a result of John's alleged scheme was fatal to its mail fraud charge. In my pretrial ruling, I refused Johns' request, finding, *inter alia*, that "the theory stated in paragraph 10(a) of the indictment that defendant defrauded Acme of his salary and benefits is unaffected by whether Acme suffered a loss measured by the value of the goods it received from the vendors." *Id.* at 1021.[32] Johns was challenging the government's failure to present evidence to the grand jury that Acme's vendors had not overcharged the company or sent it less than fair value in order to fund the kickback scheme. Such evidence would have been irrelevant to the losses alleged in subparagraph 10(a) of the indictment. Furthermore, any relevance that this evi-

---

**30.** Johns also renews his pretrial motion to strike from the indictment subparagraph 10(a) as inconsistent with *McNally* and subparagraph 10(c) as surplusage. For the reasons set forth in part II.A.1., *supra*, his request must be denied as to subparagraph 10(a), and for the reasons set forth in part II.B.2., *supra*, his request must be denied as moot as to subparagraph 10(c).

**31.** Johns attempted to take an interlocutory appeal of my decision denying his pretrial motions. The Third Circuit dismissed his appeal, holding that it lacked jurisdiction under 28 U.S.C. § 1291 to reach the merits of his claims. *See United States v. Johns*, 858 F.2d 154 (3d Cir.1988).

**32.** In that opinion, I also asserted alternative reasons why the absence of proof of a direct monetary loss by Acme did not invalidate the indictment. I am now aware that I relied on an incorrect interpretation of *McNally*. Specifically, I found that Acme's "right to control" its expenditures and its "right to know" any material information that might affect these expenditures constituted non-monetary losses which survived *McNally*. *See Johns*, 688 F.Supp. at 1022. My opinion pre-dated the Third Circuit's decision in *United States v. Zauber*, 857 F.2d 137, 147 (3d Cir.1988), *cert. denied, sub. nom., Scotto v. United States*, — U.S. —, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), in which the court specifically rejected the loss of control theory as inconsistent with *McNally*. Similarly, the loss of the right to know material information does not constitute a *McNally* property loss. *United States v. Slay*, 858 F.2d 1310, 1316 (8th Cir. 1988).

dence might have had to the losses alleged in subparagraphs 10(b) and (c) is moot in light of my conclusion that the government did not satisfy its burden of proof with respect to these losses. *See supra* part II.B.2. I therefore conclude that the proffered testimony would not have been exculpatory.[33]

 I previously determined that Johns did not satisfy the "heavy burden" of showing that the counts charged in the indictment are not supported by evidence before the grand jury. *See Johns,* 688 F.Supp. at 1022. The government need only establish that the evidence presented to the grand jury was sufficient to make a finding of probable cause. With respect to counts one through thirty-eight, the government offered testimony to the grand jury regarding Johns' annual salary, regarding his false conflict of interest questionnaires which were marked as grand jury exhibits, regarding the fact, amounts, and method of the payments received by Pak-all and Alma from Acme's brokers and vendors, and regarding Acme's ignorance of these payments. *See* Govt's Answer to Dft's Motion to Dismiss for Lack of Evidence at 2. This evidence was sufficient to establish probable cause for mail fraud. The grand jury testimony of Robert Annick, Barry Frazee, and Samuel Posner, *see id.* at Exhs. A, B, and C, respectively, was sufficient to establish probable cause that Johns violated the Travel Act, 18 U.S.C. § 1952, as charged in counts thirty-nine through forty-seven of the indictment. Because I determined in Part IV, *supra,* that the government had not satisfied its burden of proof with respect to the alleged violations of the National Stolen Property Act, 18 U.S.C. § 2314, I need not reach the issue of whether there was probable cause to support counts forty-eight through fifty-six of the indictment.

In my pretrial ruling, I carefully reviewed Johns' claims concerning the alleged abuses by the government of the grand jury process. Johns alleged that attorneys for the government had improperly "disclose[d] matters occurring before the grand jury" to Acme in violation of Rule 6(e)(2) of the Federal Rules of Criminal Procedure. For the reasons set forth in that decision, *see Johns,* 688 F.Supp. at 1024–25, I conclude, as I did then, that no violations occurred and that in any event, Johns has failed to show actual prejudice. *See The Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (court may not dismiss indictment for prosecutorial misconduct in a grand jury investigation where the misconduct does not prejudice defendant).

## VI. *Conclusion*

The mail fraud charges in this indictment are legally sufficient under the standards articulated by the Supreme Court in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and are likewise consistent with the 1988 amendment to the mail fraud statute of the federal criminal code. 18 U.S.C. § 1346. The government established beyond a reasonable doubt that the defendant, H. William Johns, "defraud[ed] Acme of the salary it paid to him and other benefits it provided to him in reliance upon and in exchange for his loyal, faithful and honest services, free from conflict of interest." Johns is therefore guilty of mail fraud as charged in counts one through thirty-eight of the indictment.

Johns is also guilty of violating the Travel Act pursuant to 18 U.S.C. § 1952 and § 2 as charged in counts thirty-nine through forty-seven of the indictment. The government proved beyond a reasonable doubt that Johns caused each of the mailings charged in counts thirty-nine through forty-seven to occur with the intent to facilitate commercial bribery as prohibited by 18 Pa.C.S.A. § 4108(a). The mailings at issue were made at Johns' direction for the purpose of distributing kickback payments from one of Acme's vendors, Anko, Inc.

---

**33.** I note that it remains an open question in the Third Circuit whether the government even has an obligation to present exculpatory evidence to the grand jury. *See United States v. Ismaili,* 828 F.2d 153, 165 & n. 13 (3d Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988).

Johns thereafter caused the payments to be deposited into checking accounts he controlled. Johns agreed with Robert Annick, the owner of Anko, that the kickback payments would favorably influence Johns' conduct with Acme with respect to Anko's business with Acme.

The government has not satisfied its burden of proof with respect to the charges in the indictment under the National Stolen Property Act, 18 U.S.C. § 2314 and § 2, because it did not establish that Acme, the alleged victim of the crimes charged in counts forty-eight through fifty-six, was defrauded of the kickback money paid to Johns. Johns is therefore not guilty of counts forty-eight through fifty-six of the indictment.

Johns' renewed pretrial motions are refused. Subparagraph 10(a) of the indictment withstands *McNally* and need not have been stricken. Subparagraphs 10(b) and (c) do not describe the same crime, but in any event, since the government's proof as to subparagraph 10(c) fails, John's request that it be stricken as surplusage is moot. The exculpatory evidence which the government allegedly did not submit to the grand jury is irrelevant to the scheme alleged in subparagraph 10(a). The evidence presented to the grand jury was sufficient to make a finding of probable cause with respect to each count for which I have found Johns guilty. The government did not violate Rule 6(e)(2) of the Federal Rules of Criminal Procedure and, regardless, Johns has not shown actual prejudice resulting therefrom.

A verdict and an order follow.

### VERDICT AND ORDER

1. The defendant, H. William Johns, is hereby found GUILTY of mail fraud, 18 U.S.C. § 1341 and § 2, as charged in counts one through thirty-eight of the indictment;

2. The defendant, H. William Johns, is hereby found GUILTY of violating the Travel Act, 18 U.S.C. § 1952 and § 2, as charged in counts thirty-nine through forty-seven of the indictment;

3. The defendant, H. William Johns, is hereby found NOT GUILTY of violating the National Stolen Property Act, 18 U.S.C. § 2314 and § 2, as charged in counts forty-eight through fifty-six of the indictment; and it is hereby ordered that:

1. Defendant's renewed pretrial motion to strike subparagraphs 10(a) and 10(c) is refused;

2. Defendant's renewed pretrial motion to dismiss the indictment for failure to present exculpatory evidence to the grand jury is refused;

3. Defendant's renewed pretrial motion to dismiss the indictment because of a pattern of Federal Rule of Criminal Procedure 6(e) violations is refused;

4. Defendant's renewed pretrial motion to dismiss the indictment for lack of evidence before the grand jury is refused; and

5. The defendant, H. William Johns, shall appear for sentencing in courtroom 6A on September 10, 1990, at 9:30 a.m.

### APPENDIX

In the United States District Court

for the Eastern District of Pennsylvania

Criminal No. 87–376

United States of America

v.

H. William Johns

### STIPULATIONS

The attached recitations of fact are hereby stipulated to be true and accurate by and between the government and the defendant. The relevance of any particular item is a matter for the Court.

(s) H. William Johns
H. WILLIAM JOHNS

(s) Edward F. Borden, Jr.
EDWARD F. BORDEN, JR.
Attorney for H. William Johns

MICHAEL M. BAYLSON
United States Attorney

(s) Richard L. Scheff
RICHARD L. SCHEFF
Assistant United States Attorney
Section Chief

/s/ William B. Carr, Jr.
WILLIAM B. CARR, JR.
Assistant United States Attorney

*Indictment Allegations*

1. At all times pertinent to this case, Acme Markets, Inc. ("Acme") was a Pennsylvania corporation with its principal place of business at 124 North 15th Street, Philadelphia, Pennsylvania, and was engaged in the retail food and grocery business.

2. Beginning in 1961, H. William Johns ("Johns") was employed by Acme as a quality control supervisor. In 1967 he became a packaging buyer. From early May of 1979 until November 1, 1984, Johns was Acme's director of packaging, equipment and supplies procurement; in this position he was in charge of Acme's purchases of non-resale items, including bags, cans, packaging supplies and janitorial supplies and services. His salary during this period ranged between approximately $40,000 and $50,000.

3. At all times pertinent to this case, Paul Aronovitz was the owner of Aronovitz Diversified Products, Inc., located in Huntingdon Valley, Pennsylvania, a broker which did business with Acme in connection with Acme's purchases of cans and other packaging items.

4. At all times pertinent to this case, Robert P. Annick was the owner of Packaging Specialities, Inc., and/or R.P. Annick Company and/or Anko, Inc., located in Lancaster, Pennsylvania. Through these entities Robert P. Annick performed as a broker doing business with Acme and also sold janitorial supplies and services to Acme.

5. From December of 1972 to January of 1980, at the request of Johns, Annick made payments to Unique Packaging and Design Consultants ("Unique Packaging"), a sole proprietorship nominally owned by Johns's wife. A portion of these payments represented compensation for artwork and design consulting services provided by Unique Packaging; the balance represented payments to Johns for business with Acme from which Annick received a brokerage commission.

6. At all times pertinent to this case, Barry A. Frazee was sales manager of Champion International Corporation ("Champion"), located in Richmond, Virginia, and/or owner of the Sabana Corporation ("Sabana"), also located in Richmond, Virginia. Champion sold paper bags to Acme. Sabana was Champion's representative in bag sales to Acme following Frazee's departure from Champion.

7. At all times pertinent to this case, Joel Busel and Samuel Posner were owners or employees of S. Posner and Sons Co. and Samson Paper Bag Co., Inc., located in Huntingdon, New York, and Samson-MidAtlantic, Inc., located in Savage, Maryland. Each of these companies sold paper bags to Acme.

8. From January of 1976 to January of 1977, at John's suggestion, S. Posner and Sons paid Unique Packaging $18,000 in anticipation of and in return for artwork and design consulting services.

9. At all times pertinent to this case, Robert L. Fritz was the owner of Fritz Brokerage Co., Inc. ("Fritz Co."), located in Cranston, New Jersey, a broker which did business with Acme in connection with Acme's purchases of paper bags and plastic wrapping film.

10. On June 15, 1978, Johns completed and submitted Acme's conflict of interest questionnaire (Exhibit 1B).

11. In August 1979, at Johns's request, Gerald Lotenberg arranged for the incorporation of Pak-all Corporation ("Pak-all"), a New Jersey corporation. The incorporating papers on file with the New Jersey Corporations Bureau reflected Lotenberg as a director and Christina Ream as the incorporator. Johns's name did not appear as an officer, shareowner or stockholder.

12. On April 2, 1982, Johns completed and submitted a second Acme conflict of interest questionnaire, which had been distributed with a cover letter (Exhibit 1C—questionnaire and letter).

13. In April of 1983, at Johns's request, Lotenberg arranged for the incorporation of Alma Trading Corporation ("Alma") and Garo Service Corporation ("Garo"), both New Jersey corporations. Lotenberg chose these names. The incorporating papers on file with the New Jersey Corporations Bu-

reau reflected Vito Seu as director of each and Jay W. Greenstone as the incorporator. Johns's name did not appear as an officer, shareowner or stockholder.

14. At Johns's suggestion, payments by check were made by the following brokers and vendors doing business with Acme, payable to and deposited into Pak-all and Alma checking accounts:

| Broker or Vendor | Time Paid | Total Amount Paid into Pak–All | Total Amount Paid into Alma |
|---|---|---|---|
| Paul Aronovitz/ Aronovitz Diversified Products | Oct. 1979–Sept. 1983 Aug. 1983–Nov. 1983 | $160,150.00 | $13,200.00 |
| Robert P. Annick/ Anko, Inc. | Jan. 1980–Aug. 1983 Sept. 1983–March 1985 | $176,484.10 | $115,662.05 |
| Barry A. Frazee/ Champion Int'l Corp./ Sabana Corp. | May 1980–Sept. 1983 Oct. 1983–Aug. 1984 | $ 96,866.30 | $ 28,746.88 |
| Joel Busel & Samuel Posner/Samson Paper Bag Co., Inc. | July 1980–July 1983 Aug. 1983–Nov. 1984 | $559,186.00 | $269,265.00 |
| Robert L. Fritz/ Fritz Brokerage Co., Inc. | April 1982–July 1983 June 1983–Aug. 1984 | $215,339.82 | $345,934.39 |
| | | $1,208,026.22 | $772,808.32 |

15. Johns did not notify his superiors at Acme that he had arranged for the incorporation of Pak-all, Alma and Garo, or that he or any company in which he had an interest was receiving the payments set forth in paragraph 14 above.

16. The United States mail was used to transmit purchase orders, invoices and checks between Acme and the brokers and vendors identified in paragraph 14 above. Johns arranged for the use of the mail by the brokers and vendors to transmit checks constituting payments from those brokers and vendors to be deposited into Pak-all and Alma bank accounts.

17. The items set forth in Counts One through Fifty-six of the indictment were placed in an authorized mail depository and were sent and delivered by the United States Postal Service, according to the directions thereon, on or about the dates listed in the indictment.

## ACME POLICIES

18. Acme's board of directors adopted a conflict of interest policy on May 14, 1976 setting forth mandatory guidelines with respect to actual or potential conflicts of interest (Exhibit 1A). That policy contemplated the completion of conflict of interest questionnaires every two years by senior employees of the company, although the distribution and completion of those questionnaires in fact occurred on a less frequent basis. The conflict of interest policy further provided that the existence of a relationship or transaction which might be a conflict of interest must "be reported promptly in writing to [Acme's] chief executive officer ..." Johns never made any such report.

19. By mid–1982, Johns was aware of a general company preference of dealing directly with vendors without a broker to the extent possible. Some large vendors insisted on the use of specific brokers, who were essentially their sales representatives for a given territory. Engaging a broker at Acme's (rather than the vendor's) insistence was left to a purchasing agent's discretion, if likely to facilitate smooth and efficient purchasing, delivery and the handling of any problems with the account.

*Robert P. Annick*

20. Robert P. Annick met Johns around 1970, while he was general manager of the folding carton division of Georgia–Pacific. They were introduced by a manufacturer's representative, or broker, in Philadelphia, as Georgia–Pacific was interested in selling folding cartons to Acme. Shortly thereafter Annick became self-employed as a broker, first doing business as R.P. Annick Company; in 1972 he incorporated as Anko, Inc. He represented packaging companies which primarily sold paper bags, grocery sacks and folding cartons. Annick began serving as a broker for Acme in 1972.

21. At the time that Annick stated doing business with Acme through Johns, Johns told Annick of a company he had started called Unique Packaging and Design consultants, which Johns envisioned to become a consortium of brokers and sales representatives with expertise in various areas, such as packaging and design. Johns requested and Annick agreed to share with him 40 percent of the commissions Annick received from sales of bags to Acme, and also solicited artwork and design services for packaging from Annick. Annick agreed to both. Between December 7, 1972 and January 2, 1980 Annick received and paid Unique Packaging invoices totaling $155,056.27 representing amounts due for both Johns's share of Annick's commissions from Acme and the artwork and design services provided by Unique Packaging.

22. Johns introduced Annick to Samuel Posner and Joel Busel, then the owners of Samson Paper Bag Company, at Samson's offices in New York in 1976. Annick had lost one of the grocery bag accounts for which he had served as a broker, and Johns made the introduction to Busel and Posner to enable Annick to become their broker. Busel and Posner entered into a commission arrangement with Annick whereby he would receive five percent of Samson's sales to Acme.

23. This arrangement lasted until mid–1980, when Johns, Busel and Posner arranged that commissions would no longer be paid to Annick but would go instead to Pak-all Corporation. Johns told Annick that the commissions would no longer be paid to him but to another company, that Annick would still receive a share of those commissions, and that Annick would no longer have any direct relationship with Samson. Thereafter, Annick began receiving his commission checks from Pak-all Corporation. Annick's share of Samson commissions dropped from five percent to three percent.

24. James Meyers was hired to work as a sales person for Annick, paid by Pak-all, in an arrangement made between Johns and Annick. Meyers primarily sold small orders of specialty bags until he received and accepted an offer from a different employer.

25. In 1981 Annick and Anko ceased to be a broker and became a janitorial supply company, selling chemical supplies to industrial accounts for in-house cleaning, such as floors and restrooms, and also providing instruction on their use. During the period pertinent to this case, Acme constituted approximately 80 percent of Anko's janitorial supply business.

26. Within a few months after Anko entered the janitorial supply business with Acme, he and Johns reached an agreement that he would pay to Pak-all 4.5% of the business that Anko did with Acme.

27. Annick approached Dale C. Jacob, Johns's subordinate who was the immediate buyer for janitorial supplies. Annick and Jacob agreed to an arrangement whereby Annick would pay Jacob 3.5% of his sales to Acme. Annick made payments

totaling $127,634.70 between July of 1981 and March of 1985 to Jacob's companies, established for this purpose, Evergreen and J & J. At some point, Annick told Johns of the amounts and percentages he was paying to Jacob. His payments to Johns continued as well.

28. In approximately August of 1983, Johns advised Annick to stop making these payments to Pak-all and to begin making them to Alma Trading Corporation. Johns told him that Alma was a better name than Pak-all and that it was a continuation of Pak-all. Payments by Annick to Unique Packaging, Pak-all and Alma, representing portions of his brokerage or janitorial businesses, were made after Annick received payment from Acme.

29. Annick also became familiar with Garo Service Company, of which Vito Seu was president. Eventually, Annick's share of the Samson commissions which he had been receiving from Pak-all started coming from Garo.

30. In the grand jury, Annick was shown the checks he issued to Pak-all and Alma between January of 1980 and March of 1985. He was asked and answered as follows:

Q. Are these the checks that were issued in accordance with your arrangement with Mr. Johns?

A. That's correct.

Q. Were they based upon a percentage of the business Anko did with Acme?

A. That's correct.

Q. Did you understand it to be a condition of your continued business with Acme that you make these payments?

A. I don't think that was ever stated as such. I think the implication was there.

*Gerald Lotenberg*

31. Gerald Lotenberg is a certified public accountant with an office in New York City and a home in New Jersey. He first met Johns at a Christmas party at a country club in New Jersey in 1978, given by Robert L. Fritz, a client of Lotenberg's. Lotenberg was contemplating a change of profession, becoming less of an accountant and more involved in business. Through certain of his clients he had some familiarity with and interest in the retail and wholesale food and packaging industries. He and Johns discussed such a venture, and in August of 1979 he and Johns formed Pak-all Corporation. In part due to Lotenberg's interest in becoming more involved in business, the corporate address was listed as Lotenberg's home address, and he was president.

32. Ultimately, Lotenberg never did phase out of accounting and take an entrepreneurial role in Pak-all or any other substantial business venture. Lotenberg did, however, maintain Pak-all's books and records, managed the bank accounts, and prepared tax returns for Pak-all as well as Johns's personal returns.

33. Checks payable to Pak-all would be received by Lotenberg at his home through the mail, and an employee of Lotenberg's would deposit them by mail to a Pak-all bank account. Disbursements were made by Lotenberg by checks which he would sign. Other than specific tax and pension account deductions within Lotenberg's accounting expertise, all other disbursements were all made at Johns's direction.

34. Johns told Lotenberg that the payments Pak-all was receiving from Fritz's company were brokerage commissions. Lotenberg also knew this from his services as Fritz's accountant.

35. Following Lotenberg's realization that he was not going to become heavily involved in a business venture, Alma Trading Company was established with the understanding that Lotenberg would only serve as its accountant. At the same time Garo Service Corporation was set up. Most of the money that was deposited into Alma was transferred into Garo and payments were then made from Garo. Although he recalled no specific conversation with Johns to this effect, Lotenberg believed that the purpose of this arrangement was that those vendors receiving payments from Garo would not know the source of the

income. For accounting purposes, that is, to reduce the number of entities requiring any significant tax return preparation, Lotenberg transferred funds otherwise undisbursed from Garo into Pak-all.

36. In terms of the earnings of Pak-all, Alma and Garo, Johns was the principal beneficiary. Lotenberg understood these companies to be receiving brokerage commissions; he had no knowledge as to whether anyone was actually doing any work to generate those commissions.

37. In the early 1980's Johns introduced Lotenberg to Barbara Evans, owner of Chelsea Sales Company, and he asked Lotenberg to prepare Evans's tax returns. Johns told Lotenberg that Evans served as a sub-broker. She received, at Johns's instruction, regular payments totaling $178,-500 between March of 1980 and November of 1984.

38. Johns identified for Lotenberg all of the companies set forth in paragraph 14 above as companies which were paying commissions to Pak-all and Alma.

39. After Alma was created, checks payable to Alma were sent to Vito Seu in New Jersey. Seu would deposit those checks and then either Seu or Johns would send or give Lotenberg copies of the deposit tickets, identifying the sources of the deposited funds. Lotenberg kept the books for Alma and Garo as well. Lotenberg kept a supply of pre-signed blank checks, signed by Vito Seu, enabling him to deposit sums from Alma into Garo and to disburse funds from Garo.

40. At Johns's direction, Lotenberg made regular payments to Seu from Alma, and also payments to Annick from Garo which Lotenberg understood to be commissions. In Annick's case, and certain others, including Al Carey, Johns would instruct Lotenberg to disburse a percentage of sums received from the original sources.

41. At Johns's direction, Lotenberg made payments from Pak-all to Unique Packaging, which he was told were for design work performed by Unique Packaging.

42. Payments were made to Lotenberg's accounting firm for his accounting services.

43. Pak-all paid salaries to Johns, his wife and two sons including amounts withheld for taxes. Pak-all also paid for Johns family travel expenses, funded a retirement account for Johns and IRA's for Johns, his wife and children; extended loans (ultimately taken as income) to Johns; and purchased automobiles, automobile insurance and related items.

44. All payments to and from Pak-all, Alma and Garo appeared on the companies' books. The accounting records of the companies were not complicated and the payments were simple to trace.

45. At no time did Johns request that Lotenberg fail to reflect any of the income into Pak-all and Alma.

46. The first twenty or so Pak-all checks were co-signed by Robert Fritz and Ronald Stone.

47. Pak-all's bank account was opened by Lotenberg at a bank three blocks from his home.

48. Lotenberg would testify that at no time did Johns ask him to do anything which Lotenberg believed to be improper, and that he believed Johns's business to be legitimate.

49. The companies' tax returns reported all income and expenses, and were timely filed. Johns knew of this. The tax returns prepared by Lotenberg for Johns and the members of his family accurately reflected the sums they ultimately received from Pak-all.

50. At some point between 1981 and 1983, Lotenberg asked Johns if there was "any problem" with Johns being paid a commission on business done with Acme by those brokers and vendors making payments to Pak-all. Johns replied that there was not since the payment of brokerage commissions was common and Acme was paying the best price on its purchases.

*Barry A. Frazee*

51. Barry A. Frazee worked for Champion International Corporation since 1976 as a

salesman and sales manager. Champion manufactured paper products, including bags; he worked for another bag manufacturing company, Hoerner Waldorf, since 1973, which was acquired by Champion in 1976. Frazee first met Johns in late 1973 or early 1974 when he was assigned to the Acme account for Hoerner Waldorf. He met Johns in his position as a sales representative approaching Acme's buyer. Hoerner Waldorf, and thereafter Champion, had made sales of paper bags to Acme. These sales ceased in 1976, but renewed in 1978. At this time Johns told Frazee that the broker for Champion's sales to Acme would be Barbara Evans, who would receive a three percent commission. Frazee met Evans five or six times at lunch or dinner with Johns. Other than receiving brokerage commissions, Frazee was unaware of Evans actually performing any services for Champion, nor did he ask her to.

52. Eventually, at Johns's suggestion, Champion stopped paying commissions to Chelsea Sales and instead began paying them to Pak-all. Frazee never met anyone from Pak-all, nor did he ever call on Pak-all to do anything for Champion. Later, Johns directed Frazee to issue the commission payments to Alma. Frazee never met anyone from Alma, either. The commission payments to Chelsea, Pak-all and Alma were issued after payment by Acme.

53. In May of 1980 Frazee started Sabana Corporation and became self-employed. He then served as an independent broker serving the Acme account for Champion. Champion paid Sabana a three percent commission on sales to Acme; by arrangement with Johns, Sabana paid half of that amount to Pak-all. Upon the creation of Alma, Johns directed Frazee to stop paying into Pak-all and begin paying into Alma.

54. Johns offered to assist Frazee when Frazee went out on his own and started Sabana; Frazee received checks from Pak-all to Sabana totaling $21,665.34 between July of 1980 and May of 1983. Frazee understood these payments to be in some way related, in amount, to Champion's business with Acme.

55. Frazee testified in the grand jury as follows with regard to Johns's connection with Pak-all:

Q. Did you know whether or not he personally had any financial interest in Pak-all or Alma Trading?

A. No, I did not.

Q. Did you assume that he had a financial interest in either of these?

A. I didn't think about it. I didn't really want to know.

Q. Is it fair to say that—Let me back up: when Mr. Johns directed you to Chelsea Sales, were you under the impression that if you wanted to do business with Acme, commissions had to be paid to Chelsea sales?

A. Yes, I was.

Q. That would be a condition of getting the business?

A. Yes.

Q. Mr. Frazee, when I asked you whether you assumed that Mr. Johns had a financial interest in Pak-all and Alma, you said you didn't really want to know. Is that because—first of all, I believe you've already testified that you believed it was a condition of getting the Acme business that commissions be paid wherever Mr. Johns told you to pay them; is that correct?

A. That's correct.

Q. If you had known that Mr. Johns had a financial interest in Pak-all or Alma; would you have understood that to be something improper?

A. I don't know that I would have understood it to be improper, but we would have done business anyway.

Q. Well, why didn't you want to know whether he a financial interest in Pak-all or Alma?

A. I just feel like as little as I know about the workings of these things the less I have to worry about sleeping at night sometimes.

*Samuel Posner and Joel Busel*

56. Samson Paper Bag Company was started around 1960 as a family business by brothers-in-law Samuel Posner and Joel Busel. Posner was president of Samson from its founding until its sale to Stone Container Corporation in December of 1982. Busel was chairman of the board of Samson at the time of the Stone acquisition, after which both Posner and Busel became sales vice presidents. Before the sale of Samson, Posner and Busel jointly ran the company, which primarily manufactured brown paper bags for sale to supermarkets.

57. During the period pertinent to this case, approximately half of Samson's sales to supermarket chains were done on a direct basis and approximately half went through brokers.

58. Samson started selling paper bags to Acme in the mid–1970's. At that time the Acme buyer was named William Fisher, who suggested the use of a brokerage company called Hilton. Sales to Acme commenced, but were insubstantial. The brokerage fee—a matter negotiated depending upon the account and the broker—was about five percent of sales.

59. Busel and Posner preferred to sell directly to customers without the use of a broker, but often found it necessary to engage them, due to either the pre-existing relationship between the broker and the customer or the geographical distance between Samson and its customers. Calling on distant accounts could be costly and difficult. An active broker would call on a customer weekly, or at least monthly, and use his influence and relationship to obtain orders. He would also take care of problems which might arise if a customer was unhappy with the timing or quality of a delivery.

60. Market prices for paper bags fluctuate widely and frequently. Supermarket chains generally purchase paper bags from multiple sources at a time, and orders are usually placed one to two weeks in advance, or sometimes even daily.

61. Eventually Fisher was replaced by Johns as the Acme buyer with responsibility for purchasing supplies.

62. Johns introduced Busel and Posner to Annick, suggesting their use of Annick as a broker. They all agreed to the following arrangement:

Annick would bill Acme using his company name, rather than having Samson bill Acme; Samson's name did not appear on invoices received by Acme. Posner and Busel understood that prior to Johns's tenure, Samson had not been a favored account with Acme in the past, and that Johns felt that disguising Samson's business might prevent other Acme management people from discovering and terminating the relationship. In furtherance of this, Johns, Busel and Posner agreed that delivery of Samson bags would be in unmarked trucks, rather than Samson's own trucks bearing the company name. They also agreed to delete the company logo from the bottoms of the bags, but to add an identifying code for quality control purposes. Sales of bags to Acme increased substantially after Samson engaged Annick as a broker in late 1976. In Busel's and Posner's view, Annick was active in soliciting and following up on the business.

63. Busel and Posner also had a company, S. Posner and Sons, which was a paper distributor which had done business with Acme. Soon after Johns became the bag buyer and met Busel and Posner, he advised them that he owned a company called Unique Packaging and Design Consultants and he solicited business from Busel and Posner. Unique Packaging was to provide design and package consulting services. Johns represented Unique Packaging to have a few employees. They agreed to a monthly charge of $1,000 per month, beginning in January of 1976, in exchange for which Busel and Posner anticipated and received some design services. They did not believe that they were getting value from the arrangement and they met with Johns and told him they would like to end it.

64. Johns told them that he needed some time to make changes at Unique

Packaging to cut his overhead costs, and they settled on a $6,000 lump sum in January of 1977 for a total of $18,000.

65. In mid–1980 Johns told Busel and Posner that they should cease paying commissions to Annick and begin paying them into Pak-all. The individual whom they understood to be the principal of Pak-all was Lotenberg, with whom they spoke on the telephone but never met. Johns assured them that there would be no problem with Annick claiming a continued entitlement to commissions. Once Pak-all entered the picture Samson billed Acme directly and thereafter mailed the commission checks to Pak-all's New Jersey address.

66. As far as Posner and Busel were concerned, Pak-all and Lotenberg did little, other than the fact that they were well regarded by Johns and Lotenberg was the designated broker.

67. In approximately June of 1983, Johns told Busel and Posner that future commission checks should be made payable to Alma. There was no change in Samson's relationship with Alma compared to its relationship with Pak-all; the commission checks were simply paid to Alma instead and were mailed to another address in New Jersey. Commission checks were issued by Samson after it had been paid by Acme.

68. Posner testified in the grand jury as follows:

Q. In terms of brokers that you were directed to by Johns; originally Robert Annick and then Pak-all and then Alma, was it your understanding that if you wanted to keep or increase Acme business you would have to go to the brokers to which he directed you?

A. Yes.

Q. It is common in your industry in selling to large supermarket chains that you may be directed to brokers by buyers?

A. Yes it is.

Q. Is it generally your understanding that if you don't go to that broker to which you were directed by a buyer that you are not going to keep or increase your business?

A. This is the case, yes.

69. Samson never in fact called upon Lotenberg at Pak-all or Vieo Seu at Alma to perform any services for Samson as a broker.

### Ronald K. Stone

70. During the period pertinent to this case Ronald K. Stone was president and owner of Ron Stone Associates and Kasha, Inc., each located in Red Bank, New Jersey, and he served as a broker for packaging supplies sold to Acme by S & M Marketing Co., located in White Plains, New York. When the Pak-all bank account was originally opened, Stone was listed as its vice-president and secretary, and he was one of the authorized signatures on the account, along with Fritz and Lotenberg. In addition, the only telephone listed in Pak-all's name was in Stone's office in New Jersey.

71. Stone never received any funds from Pak-all, Alma or Garo, although he did make one payment to Alma in 1984. Stone asked Johns for a reference when Stone was attempting to become a broker for Mobil Oil Company's plastic bag line. Some time after Mobil agreed to use Stone, Stone gave Johns a check, payable to Alma, for $2,600.48, a portion of the commissions Stone received on Mobil's sales to Acme.

72. Between January of 1980 and August of 1984, Stone and S & M Marketing made payments of $107,172.13 to Johns's subordinate, Dale C. Jacob, which represented an agreed upon percentage of S & M's profits from sales to Acme. There is no evidence that Johns was involved in, or aware of, Stone's arrangement with Jacob.

### Barbara Evans

73. Barbara Evans became acquainted with Johns in approximately 1970 or 1971. At the time she was a waitress at Stouffer's Restaurant in Philadelphia, and Johns met her there as he and others in the industry frequently ate there. She left

that job in 1977 and sometime thereafter worked for a computer company in New Jersey doing secretarial, word processing and data processing work. She worked at that job full time until July of 1985.

74. With Johns's assistance and sometime after leaving her waitressing job, Evans set up Evans Sales Company. The actual tasks she performed included price checking on design for greeting cards and checking for defective paper and plastic bags at Acme stores. Johns would send her to various Acme locations to retrieve reportedly defective bags. According to Evans, since she had a full-time job, this was work she was available to perform on evenings and weekends. She also performed these services for Barry Frazee and Robert Fritz at Johns's direction.

75. In early 1980 Evans changed the name of her business to Chelsea Sales Company; her functions did not change. Evans received $178,500 from Pak-all and Garo between March of 1980 and November of 1984.

76. Exhibit 34A is a flow chart setting forth the revenues from Acme brokers and vendors into Pak-all and Alma and the disbursements from them. Between October of 1979 and September of 1983 the brokers and vendors paid $1,208,026.22 into Pak-all; between June of 1983 and March of 1985 they paid $772,808.32 into Alma, for a total of $1,980,834.54 between October of 1979 and March of 1985. Only Anko made payments—totaling $19,130.89—after November of 1984, the month Johns's employment at Acme terminated as a result of the events which are the basis of this prosecution.

77. Of the $772,808.32 deposited into Alma, $694,500.00 was transferred by Lotenberg into Garo. $2,800.00 was paid as salary to Vito Seu. $6,472.55 of the balance (along with $5,290.53 from Pak-all) was used to pay telephone bills.

78. Of the $694,500.00 transferred from Alma to Garo, $534,000.00 was further transferred into Pak-all. The miscellaneous expenditures of $9,800 from Garo include $3,000 in legal fees and the purchase

of an automobile for Johns's secretary at Acme. An additional $6,462.70 was expended by Pak-all on more varied miscellaneous expenses.

79. Anko received $80,119.00 from Pak-all and $41,602.00 from Garo, representing the portion of Samson commissions Annick continued to receive after the formation of Pak-all.

80. Chelsea Sales Company received $135,500.00 from Pak-all and $43,000 from Garo representing Barbara Evans's salary.

81. Pak-all expended $2,850.00 to pay the funeral expenses for Vito Seu's wife.

82. Other Pak-all disbursements included $81,797.60 to Al Carey; $37,475.00 to Unique Packaging (which was thereafter used to pay Johns family personal bills, such as utilities, credit cards and charge accounts); $115,793.93 to Lotenberg's firm for accounting expenses; $8,605.03 to Robert L. Fritz & Sons for a business venture unrelated to Fritz's business with Acme; $36,841.81 to John Meyers, who had worked with Annick; $21,665.34 to Sabana (Barry A. Frazee); and $51,165.23 in taxes.

83. In addition to the $37,475.00 from Pak-all to Unique Packaging which was thereafter used to pay Johns family personal expenses, Pak-all disbursed $1,273,139.21 to, or for the direct benefit of, Johns and his family including: $950,335.60 in salaries, travel and loans to Johns later taken as salary ($42,181.31 represented salaries to Mrs. Johns and their two sons); $234,227.72 to Johns's retirement trust account and a total of $10,000 to IRA's for each of the four family members; and $78,495.79 for the purchase of four automobiles, insurance and related expenses. $231,547.00 of the $950,335.60 was withheld by Lotenberg and deposited into an account for income tax withholding.

84. In his position to Acme, Johns was an aggressive, knowledgeable and determined negotiator, both with those making payments to Pak-all and Alma and with others.

85. Stone, Posner, Busel, Zeitler, Frazee and Jacob would each testify that the prices charged Acme over each year of

Johns's tenure were less than or equal to those charged other similarly sized purchasers buying on similar terms. They would also testify that the terms on which they sold to Acme were no less favorable than those extended to other supermarket chains. There is no evidence that the situation would be different with regard to prices charged by Aronovitz and Fritz. Acme made its buyers aware they were not permitted to violate the Robinson–Patman Act by inducing their vendors to sell to Acme at lower prices, or on terms more favorable, than those offered to Acme's competition.

86. The prices charged to Acme by the vendors identified in paragraph 14 above were not inflated, in comparison to prices they were charging other accounts, in order to fund the payments to Unique Packaging, Pak-all and Alma.

87. After Johns left Acme, Acme conducted a comparison of floor care chemicals and material costs and discovered that the only competitor willing to supply the same grade product to Annick with the same level of service would charge Acme substantially more per year than Annick, perhaps in excess of $400,000.00.

88. The initial concept for a company such as Pak-all came about through discussions among Johns, Annick, Fritz and Stone. The company was to be a consortium of knowledgeable food brokerage professionals for mutual benefit.

*Status of Other Parties*

89. Robert P. Annick pleaded guilty to an information charging him with one count of mail fraud and one count of conspiracy predicated upon his payments of $265,683.02 into Pak-all and Alma between January of 1980 and October, 1984. In exchange for his guilty plea and cooperation, the government agreed to make no recommendation as to his sentence. Judge Cahn imposed a sentence of five years probation, 500 hours of community service and a fine of $10,000. E.D.Pa.Criminal No. 85–487.

90. George Landi pleaded guilty to an information charging him with one count of mail fraud and one count of conspiracy predicated upon his payments of $37,955 into companies set up by Johns's subordinate, Dale C. Jacob, between June of 1980 and September of 1984. In exchange for his guilty plea and cooperation, the government agreed to make no recommendation as to his sentence. Judge Katz imposed a sentence of five years probation and a fine of $10,000. E.D.Pa.Criminal No. 87–378.

91. Ronald Stone and Seymour Zeitler pleaded guilty to an information charging Stone with two counts of mail fraud and Zeitler with one count each of mail fraud and conspiracy predicated upon their payments to Dale Jacob's companies of $107,-172.13 between January of 1980 and August of 1984. In exchange for their guilty pleas and cooperation, the government agreed to make no recommendation as to their sentences. Judge O'Neill has not yet imposed sentence. E.D.Pa.Criminal No. 87–377.

92. Dale C. Jacob pleaded guilty to an information charging him with three counts of mail fraud, predicated upon his receipt of $581,752.80 from Acme brokers and vendors between January of 1980 and May of 1985. In exchange for his guilty plea and cooperation, the government agreed to advise the Court of his cooperation, reserving the right to recommend sentence. Judge Weiner imposed a sentence of three years imprisonment and a fine of $5,000. Jacob has a Rule 35 motion pending. E.D.Pa. Criminal No. 87–379.

93. Samuel Posner and Joel Busel were immunized by the government.

94. Gerald Lotenberg and Barry Frazee testified before the grand jury without requesting or receiving immunity and were not prosecuted.

95. Paul Aronovitz and Robert Fritz were not immunized, did not testify before the grand jury and have not, to date, been prosecuted.

EXHIBIT 1A
## AMERICAN STORES COMPANY
Conflict of Interest:

Company Policy and Guidelines of
Responsibility

The Board of Directors of American Stores Company, in keeping with policy considerations which have been followed by the Company for many years, has adopted the following guidelines with respect to actual or potential conflicts of interest for the guidance of all officers and employees of the Company and its subsidiaries.

1. A conflict of interest shall be understood as a relationship or transaction that does or may:

(a) provide gain or benefit to an individual or a member of his family which may be at the expense of or to the disadvantage of his or her employer;

(b) result in a situation which may be inconsistent with the proper performance of assigned duties and responsibilities; or

(c) affect an individual's objective judgment and/or action with respect to any transaction between the individual's employer, its customers or suppliers.

2. Disclosure of conflicts of interest, actual or potential, is obligatory. Designated officers and employees will be required to complete and return a questionnaire bi-annually as to such matters as interests in competitors, relations with suppliers, or consulting arrangements. The existence at any time of a relationship or transaction which is or may be a conflict of interest must be reported promptly in writing to the chief executive officer of the individual's employer.

3. Each conflict of interest, actual or potential which is reported, shall be reviewed by the chief executive officer of the employer or his designee. Upon notice received, the officer or employee shall promptly terminate the conflict of interest and shall so advise the chief executive officer in writing.

4. Failure to report a conflict of interest, actual or potential, or otherwise comply with the guidelines set forth herein, shall make the officer or employee subject to disciplinary action.

The foregoing statement of policy was adopted by the Board of Directors of American Stores Company on May 14, 1976.

Attest(s) John W. Edstrom
Secretary

July 9, 1976

## Acme Markets, Inc.

(hereinafter called "the Company")

QUESTIONNAIRE REGARDING
CONFLICT OF INTEREST

1. (a) Since May 1, 1976 to date, have you or any member or members of your family occupied a position with, owned stock in or had a financial interest with any person, or in any firm, partnership, corporation or association with which the Company has, during the above period, transacted business or with whom the Company has contemplated transacting business?

YES___ NO X

(b) Since May 1, 1976 to date, have you or any member or members of your family occupied a position with, owned stock in or had a financial interest with any person, or in any firm, partnership, corporation or association with which the Company has, during the above period, been in direct competition?

YES___ NO X

(c) Since May 1, 1976 to date, have you or any member or members of your family received any payment or reimbursement, either in cash or otherwise, for services performed, either in the nature of personal services, consulting services or otherwise, for, at the direction of or on behalf of any person, firm, partnership, corporation or association with which the Company has, during the above period, transacted business or with whom the Company has contemplated transacting business or with whom the Company has, dur-

ing the above period, been in direct competition?

YES___ NO X

(d) Since May 1, 1976 to date, have you or any member or members of your family had any arrangement, understanding or agreement, whether written or oral, not covered by the above, whereby you or any member or members of your family benefit financially from any business transacted by the Company with any other person, firm, partnership, corporation or association?

YES___ NO X

If any of the answers above is "yes", please furnish complete details identifying the nature of the financial interest, transaction or payment. In addition, please furnish the identity of the person, firm, partnership, corporation or association involved and any other pertinent information which you deem descriptive of the matter so identified.

2. Since May 1, 1976 to date, has anyone with whom you transact business on behalf of the Company approached you or any member or members of your family suggesting financial benefit to you or any member or members of your family whether on the basis that said individual or his company or firm receive preferential treatment, confidential information or an order or commitment from the Company for furnishing of services, supplies, merchandise or any other thing of value, or otherwise.

YES___ NO X

If your answer is "yes", please furnish the name of the individual involved, together with a statement setting forth complete details concerning the offer.

1. (a) Since May 1, 1976 to date, have you or any member or members of your family received or been offered any gift of material value or been extensively entertained by anyone with whom you transact business on behalf of the Company?

YES___ NO X

If your answer is "yes", please furnish the name of the individual, the name of the organization that person represents, the date or dates of the offer, gift or entertainment, and if a gift, your disposition of same.

Since May 1, 1976 to date, has there been any other situation not specifically covered by the foregoing which could reasonably be construed as giving rise to a possible conflict of interest involving you and your representation of the Company in the transaction of its business?

YES___ NO X

If the answer is "yes", please set forth the same in reasonable detail.

I hereby acknowledge receipt of a copy of the Statement of Policy regarding Conflict of Interest and Guidelines of Responsibility adopted by the Board of Directors of American Stores Company on May 14, 1976.

NAME: H. William Johns
(Please Print)

PRESENT POSITION WITH THE COMPANY: Director–Packaging, Equipment And Supplies Procurement

DATE: 6–15, 1978
(s) H. William Johns

EXHIBIT 1C

ACME MARKETS, INC.

an American Stores Company

April 5, 1982

Dear Acme Co–Worker:

In accordance with the directive of the Board of Directors of American Stores Company regarding Conflict of Interest, I am enclosing a copy of the Conflict of Interest Questionnaire, together with the Statement of Policy and Guidelines of Responsibility regarding Conflict of Interest under which our Company operates. The completion of the Questionnaire and the review of the Policy Statement is a mandatory requirement for you as a key employee of the Company.

You should carefully read the Statement of Policy and refer to it in answering the questions contained in the Questionnaire.

ACME MARKETS, INC.

By signing and returning the Questionnaire, you will be acknowledging receipt of the Statement of Policy. You should also retain the Statement for future reference since you have a continuing obligation to report any relationship or transaction which is, or may be, a conflict of interest at the time when such an incident arises. I cannot stress too strongly your obligation to promptly and fully disclose such a conflict, actual or potential, as failure to comply with the enclosed guidelines can only result in the initiation of disciplinary action.

For the purpose of completing the Questionnaire, the Company considers anyone related to you by blood (parents, brothers, sisters, children or grandchildren) or marriage (spouse, parents, brothers, sisters and children of spouse and sons- and daughters-in-law) as a member of the family.

If you have any doubts concerning whether or not a particular situation fits within the Statement of Policy or the inquiries contained in the Questionnaire, you should feel free to contact me or Dan Hanlon at 215/568-3000, who will treat such an inquiry in confidence. You should be aware, however, that full disclosure of any questionable situations is required by this policy.

Please complete the enclosed Questionnaire and return it to your supervision within five (5) days of receipt.

Also included with the above Policy and Questionnaire are two other American Stores Company policies: Legal and Ethical Standards–Company Policy and Guidelines of Responsibility and Policy concerning Political Activities. You should read them, keep for future reference, and adhere to them.

Thank you for your cooperation and follow-through.

Sincerely,

(s) Thomas W. King
Thomas W. King
President

(hereinafter called "the Company")

QUESTIONNAIRE REGARDING
CONFLICT OF INTEREST

1. (a) Since June 1, 1978 to date, have you or any member or members of your family occupied a position with, owned stock in or had a financial interest with any person, or in any firm, partnership, corporation or association with which the Company has, during the above period, transacted business or with whom the Company has contemplated transacting business?

( ) YES (X) NO

(b) Since June 1, 1978 to date, have you or any member or members of your family occupied a position with, owned stock in or had a financial interest with any person, or in any firm, partnership, corporation or association with which the Company has, during the above period, been in direct competition?

( ) YES (X) NO

(c) Since June 1, 1978 to date, have you or any member or members of your family received any payment or reimbursement, either in cash or otherwise, for services performed, either in the nature of personal services, consulting services or otherwise, for, at the direction of or on behalf of any person, firm, partnership, corporation or association with which the Company has, during the above period, transacted business or with whom the Company has contemplated transacting business or with whom the Company has, during the above period, been in direct competition?

( ) YES (X) NO

(d) Since June 1, 1978 to date, have you or any member or members of your family had any arrangement, understanding or agreement, whether written or oral, not covered by the above, whereby you or any member or members of your family benefit financially from any business transacted by the Company with any other person, firm,

partnership, corporation or association?

( ) YES (X) NO

If any of the answers above is "YES", please furnish complete details identifying the nature of the financial interest, transaction or payment. In addition, please furnish the identity of the person, firm, partnership, corporation or association involved and any other pertinent information which you deem descriptive of the matter so identified.

2. Since June 1, 1978 to date, has anyone with whom you transact business on behalf of the Company approached you or any member or members of your family suggesting financial benefit to you or any member or members of your family whether on the basis that said individual or his company or firm receive preferential treatment, confidential information or an order or commitment from the Company for furnishing of services, supplies, merchandise or any other thing of value, or otherwise?

( ) YES (X) NO

If your answer is "YES", please furnish the name of the individual involved, together with a statement setting forth complete details concerning the offer.

3. Since June 1, 1978 to date, have you or any member or members of your family received or been offered any gift whose fair market value is in excess of $100 or participated in attending events or accepting trips outside the vicinity of your personal residence which were paid for, in whole or in part, by anyone with whom you transact or have been asked to transact business on behalf of the Company?

( ) YES (X) NO

If your answer is "YES", please furnish the name of the individual, the name of the organization that person represents, the date or dates of the offer, gift, event or trip, and if a gift, your disposition of same.

4. Since June 1, 1978 to date, if you are involved in or are responsible for the sale of any of the Company's products other than through its retail units, have you offered or given to any purchaser or prospective purchaser of such products anything of value (other than normal entertainment or promotional expenditures falling within stated Company policies) in order to procure or attempt to procure such sale which was not clearly reflected on the invoice for such products as part of the customary commercial terms of sale for such a product?

( ) YES (X) NO

If the answer is "YES", please set forth the same in reasonable detail below.

5. Since June 1, 1978 to date, has there been any other situation not specifically covered by the foregoing which could reasonably be construed as giving rise to a possible conflict of interest involving you and your representation of the Company in the transaction of its business?

( ) YES (X) NO

If the answer is "YES", please set forth the same in reasonable detail below.

I hereby acknowledge receipt of a copy of the "Statement of Policy regarding Conflict of Interest and Guidelines of Responsibility" which was reaffirmed by the Board of Directors of American Stores Company on March 11, 1981.

NAME: H. William Johns
(Please Print)

Present Position With the Company: Director, Packaging, Equipment and Supplies Procurement

DATE: April 2, 1982

(s) H. William Johns
(Signature)